IAN N. FEINBERG (SBN 88324)
ifeinberg@feinday.com
M. ELIZABETH DAY (SBN 177125)
eday@feinday.com
MARC BELLOLI (SBN 244290)
mbelloli@feinday.com
HONG LIN (SBN 249898)
hlin@feinday.com
JEREMIAH ARMSTRONG (SBN 253705)
jarmstrong@feinday.com
FEINBERG DAY ALBERTI LIM & BELLOLI LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone: 650.618.4360
Facsimile:  650.618.4368

Attorneys for Plaintiff
NSS Labs, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NSS LABS, INC., | CASE NO. 3:18-cv-05711 |
| Plaintiff, | |
| v. | **COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, AND THE CARTWRIGHT ACT, CALIFORNIA BUSINESS & PROFESSIONS CODE §16720** |
| CROWDSTRIKE, INC., SYMANTEC CORPORATION, ESET, LLC, ANTI-MALWARE TESTING STANDARDS ORGANIZATION, INC. AND DOES 1-50, INCLUSIVE, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff NSS Labs, Inc. ("NSS Labs") files this Complaint against CrowdStrike, Inc. ("CrowdStrike"), Symantec Corporation ("Symantec"), ESET, LLC, ("ESET"), Anti-Malware Testing Standards Organization, Inc. ("AMTSO"), and Does 1-50, inclusive (the "Does") (CrowdStrike, Symantec, ESET, AMTSO and the Does will be collectively referred to as "Defendants") for violations of the Sherman Act, 15 U.S.C. § 1 and the Cartwright Act, California Business & Professions Code §16720.

## THE PARTIES

1.      Plaintiff NSS Labs is a corporation formed under the laws of the State of Delaware, with its principal place of business located at 3711 S MoPac Expy #400, Austin, TX 78746.

2.      Defendant CrowdStrike is a corporation formed under the laws of the State of Delaware with places of business located at 150 Mathilda Place Sunnyvale, California 94086 and 15440 Laguna Canyon Rd, Suite 250, Irvine, California. CrowdStrike may be served through its registered agent, Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

3.      Defendant Symantec is a corporation formed under the laws of the State of Delaware with its principal place of business at 350 Ellis Street, Mountain View, California 94043.   Symantec may be served through its registered agent, Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      Defendant ESET is a California limited liability company with its principal place of business at 610 West Ash Street, Suite 1700, San Diego, California 92101.   ESET may be served through its registered agent, Alexandra Albro, at the above address.

5.      Defendant AMTSO is a corporation formed under the laws of the State of California with its principal place of business located at 325 Sharon Park Dr., Suite 460, Menlo Park, California. AMTSO may be served with process through its registered agent, Paul Tauber, One Montgomery St, Suite 3000, San Francisco, CA. 94104.   A listing of the members of AMTSO is at https://www.amtso.org/members/.

6.      NSS Labs is informed and believes and thereon alleges that the Does, like Defendants CrowdStrike, ESET and Symantec, are (a) manufacturers and sellers of a type of cybersecurity

product called an Endpoint Protection ("EPP") platform and more specifically a type of EPP product known as an Advanced Endpoint Protection ("AEP") product; and (b) are members of AMTSO. "Platforms" and "products" will be used interchangeably herein, although often vendors refer to a suite of EPP products as a "platform" with a common name, as does CrowdStrike with its Falcon "platform" comprising various Falcon "products."

7.     NSS Labs is informed and believes and thereon alleges that some or all of the Does have a principal place of business in this District, are incorporated in California within this District, may be served with process through a registered agent within this District, and/or are otherwise subject to personal jurisdiction in this District.  NSS Labs may seek leave to amend this complaint to allege the true names of the Does when their identities are ascertained.

8.     Defendants CrowdStrike, Symantec, ESET and the Does will be referred to collectively herein as the "EPP Vendor Conspirators."  The EPP Vendor Conspirators together with AMSTO will be referred to collectively herein as the "Conspirators" or "Defendants."

**JURISDICTION AND VENUE**

9.     The agreements and conduct as herein alleged are per se violations of the Sherman Act, 15 U.S.C. § 1 and the Cartwright Act, Cal. Bus. & Prof. Code §16720 or, alternatively, unreasonably restrain trade in violation of those statutes.

10.     Jurisdiction over Counts I through VIII for violation of the Sherman Act, 15 U.S.C. § 1 is based upon Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.

11.     Jurisdiction over Counts IX and X for violation of the California Cartwright Act is based upon 28 U.S.C. §1367(a) because they are based upon a common nucleus of operative facts with NSS Labs' federal claims, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

12.     Defendants' acts as herein alleged were within the flow of, were intended to, and do have a substantial effect on the foreign and interstate commerce of the United States.

13.     Defendants' acts as herein alleged were entirely or largely conducted by and through their participation in the AMTSO Executive Committee, Board or Directors, and/or working groups in California that resulted in AMTSO's adoption of  its "Testing Protocol Standard for the Testing of

Anti-Malware Solutions (Version 1.0)" on May 22, 2018 (the "AMTSO Testing Standard") in California within this District and, for this reason among others, California law, including the Cartwright Act, applies to Defendants' acts as herein alleged.  A true and correct copy of AMTSO Testing Standard is attached hereto as **Exhibit A** and is publicly available at https://www.amtso.org/wp-content/uploads/2018/05/AMTSO-Testing-Protocol-Standard-for-the-Testing-of-Anti-Malware-Solutions-v1.0.pdf.

## INTRADISTRICT ASSIGNMENT

14.     Pursuant to Local Rule 3-2(c), this case is subject to district-wide assignment because it is an antitrust action.

## INTRODUCTION

15.     NSS Labs, the world's leading provider of cybersecurity testing services, is the direct target of a conspiracy among the EPP Vendor Conspirators, orchestrated in whole or in part through AMTSO, to restrict competition in the testing of cybersecurity products that are critical to, but often fail at, the protection of computer systems operated by governments, businesses and consumers.  NSS Labs already has suffered substantial damages flowing from the antitrust injury it suffered as a result of the conspiracy and will suffer further injury, including irreparable injury such as permanent loss of market share, unless the acts in furtherance of the conspiracy are enjoined.

16.     Independent testing of cybersecurity products including EPP products is essential for customers to have accurate information regarding the performance of these products because few, if any, customers have the ability to accurately test EPP products for themselves, and even for those who do have such ability, performing tests on EPP products would be cost-prohibitive and take far too much time.

17.     At a minimum, the Conspirators comprise (1) EPP Vendor Conspirators who offer EPP platforms to customers and (2) AMTSO, an organization whose sole purpose is to impose protocols and restrictions on those testing the products of EPP vendors.  Although EPP product testers, including NSS Labs, have been members of AMTSO, most of them have sought to prevent the adoption of unlawful testing standards.  EPP product testers including NSS Labs, AV-Comparatives, AV-Test and SKD LABS, voiced their opposition to adoption of the AMTSO Testing

Standard in a variety of ways, including through feedback in committee meetings, votes, and formally in a letter to the President of AMTSO sent by NSS on May 19, 2018.  In that letter, NSS Labs stated, among other things:  "Instead of using the Draft Standard to improve product offerings and protect the end user, vendors have repeatedly used it as a tool to demonstrate their dissatisfaction with tests where they have underperformed or with test results that they have been unable to use to support their marketing claims. Although the Draft Standard calls for testers to test any solution, it does little to ensure that vendors cannot block or prevent testers from procuring the product to conduct a test, nor does it prevent vendors from intentionally sabotaging a test. We have observed that the AMTSO forum (currently dominated by vendors) has on more than one occasion attempted to limit what a test may validate and how a test organization may engage.  In short, AMTSO is being used to set the terms by which a test can be conducted instead of being used to set the standards that products should be expected to meet."  A true and correct copy of the May 19, 2018 letter is attached hereto as **Exhibit B**.

18.    NSS Labs voted against adoption of the AMTSO Testing Standard when adoption was put to a vote of the AMTSO membership and is informed and believes and thereon alleges that AV-Comparatives, AV-Test and SKD LABS also voted against adoption of the AMTSO Testing Standard.  NSS is also informed and believes and thereon alleges that other EPP product testers voiced opposition to the adoption of the AMTSO Testing Standard but nevertheless voted for its adoption because EPP Vendor Conspirators threatened not to use their testing services if they voted against adoption of the AMTSO Testing Standard.

19.    The EPP Vendor Conspirators, by and through AMTSO and otherwise, seek to restrict and have restricted competition in the testing of EPP products and AEP products to preclude objective and accurate testing, thus restricting competition among EPP products and AEP products based on quality and therefore also restricting competition among EPP products and AEP products based on price.

20.    The EPP Vendor Conspirators, by and through AMTSO and otherwise, also seek to restrict and have restricted competition in the markets for EPP product services testing and AEP product testing services in which NSS Labs competes.

21.     The EPP Vendor Conspirators orchestrated their conspiracy in whole or in part through AMTSO which, at their behest, adopted the AMTSO Testing Standard.  Among other things, the AMTSO Testing Standard "provides testing protocol and behavior expectations for testers and vendors relating to the testing of anti-malware solutions.  It specifies the information to communicate and how that information should be communicated between testers and vendors with products or solutions that may be included in public and private tests."   *See* **Exhibit A**.

22.      Moreover, the EPP Vendor Conspirators agreed to refuse to deal with and boycott any EPP testing company seeking to test or testing EPP and AEP products that does not agree to adhere to the AMTSO Testing Standard.  As set forth in further detail below, such behavior is per se illegal under the relevant antitrust laws or, at a minimum, unreasonably restrains competition in the relevant markets defined below.

23.     The EPP Vendor Conspirators agreed among themselves at least as early as February 2016 that they would only allow their products to be tested by EPP testing companies who would adhere to the AMTSO Testing Standard once adopted (and to the policies reflected in the AMTSO Testing Standard even before it was adopted) and would not allow their products to be tested by testing companies like NSS Labs that did not adhere to the AMTSO Testing Standard or the policies it reflected.

24.     There is no pro-competitive justification for the AMTSO Testing Standard, or even the existence of AMTSO, which even without the conspiracy among EPP Vendor Conspirators to boycott certain EPP product testers would likely lead to the *de facto* boycott of other testing protocols and therefore restrain competition in the market for EPP product testing and competition in the market for EPP products.  AMTSO's efforts at determining how EPP products are tested does not advance compatibility, interoperability, consumer safety or any other pro-competitive basis for standardization.  Rather, AMTSO and the AMTSO Testing Standard exist solely to enable EPP product vendors to avoid competition on quality and price with no offsetting benefits to competition.

## BACKGROUND FACTS

## CYBERSECURITY AND CYBERSECURITY PRODUCTS

25.     According to the Department of Homeland Security, "Our daily life, economic

vitality, and national security depend on a stable, safe, and resilient cyberspace.  Cyberspace and its underlying infrastructure are vulnerable to a wide range of risks stemming from both physical and cyber threats and hazards.  Sophisticated cyber actors and nation-states exploit vulnerabilities to steal information and money and are developing capabilities to disrupt, destroy, or threaten the delivery of essential services.  On May 16, 2018, the Department of Homeland Security released a strategy to provide the Department with a framework to execute our cybersecurity responsibilities during the next five years to keep pace with the evolving cyber risk landscape by reducing vulnerabilities and building resilience; countering malicious actors in cyberspace; responding to incidents; and making the cyber ecosystem more secure and resilient."  https://www.dhs.gov/topic/cybersecurity.

26. Cybersecurity is the activity, process, ability or capability to protect communications systems and the information contained from and/or defend against damage, unauthorized use, modification or exploitation of that system or the information contained therein.  More specifically, cybersecurity, computer security or IT security is the protection of computer systems from theft of or damage to their hardware, software or electronic data, as well as from disruption or misdirection of the services they provide.  Cybersecurity includes protecting against harm that may be caused by malicious data and code injection. With increasing reliance on computer systems, the Internet and wireless networks such as Bluetooth and Wi-Fi, and due to the growth of "smart" devices and the various tiny devices that constitute the Internet of Things, cybersecurity is of growing importance.

27. As described above, one category of cybersecurity product is EPP products.  These products are primarily designed for protecting endpoint devices (such as personal computers, laptops, smartphones and tablets) in an enterprise or consumer IT environment.

28. An AEP product is one type of an EPP product.  AEP products attempt to continuously monitor threats to file systems and provide end-to-end visibility into threats for the end user/enterprise, which allows users to take action against threats in real time.  Continuous monitoring is performed through constant analysis of suspicious code, identification of communications with malicious hosts, detection of post-infection movements within networks, and secondary compromises that occur within an enterprise network. AEP products are capable of providing enhanced detection of malware, exploits, unknown threats, and several classes of blended threats.

29.     NSS Labs is informed and believes and thereon alleges that despite their use of cybersecurity products, in 2017 more than half of all companies experienced one or more successful cyberattacks that compromised data and/or IT infrastructure.

**VULNERABILITES IN EPP PRODUCTS**

30.     In computer security, a vulnerability is a specific weakness that renders a computer system open to exploitation by a given threat or susceptible to a given hazard by an attacker who is able to perform unauthorized actions within a computer system and/or to prevent the performance of authorized actions within a computer system.

31.     One type of threat to cybersecurity is "malware." Malware is any software intentionally designed to cause damage to a computer, server or computer network after it is implanted or introduced in some way into a computer. It can take the form of executable code, scripts and active content. Other software often takes the form of computer viruses, worms, Trojan horses, ransomware, spyware, adware and scareware, among others. Malware has a malicious intent, acting against the interest of the computer user, and thus is distinguishable from a "software bug."

32.     Endpoints such as personal computers, laptops, tablets and smartphones often have vulnerabilities to cyberattacks, including malware. Unfortunately, EPP products, which are intended to protect endpoints from cyberattacks, often fail to do so ("EPP Security Defects"), which leave endpoints they are supposed to protect open to certain cyberattacks.

33.     In NSS Labs' experience, EPP vendors, including AEP vendors, frequently make unsubstantiated and/or overstated claims about the lack of EPP Security Defects in their products and therefore the ability of their products to detect, prevent, or remediate cyberattacks perpetrated by criminals and state actors. In fact, in NSS Labs' experience, most EPP products, including AEP platforms, do not live up to their performance claims and, even when they do literally live up to their performance claims, the protections are often so limited that they can be evaded.

34.     Thus, it is essential for customers and potential customers of EPP products, including AEP products, to have access to accurate and unbiased tests of EPP products that are not controlled or directed by the EPP product companies themselves since customers and potential customers generally have no ability to evaluate the performance of EPP products for themselves.

35.     Moreover, access to accurate and unbiased tests of EPP products that are not controlled or directed by EPP product companies themselves is also necessary to encourage new entrants.  This is because, without such accurate and unbiased tests, a potential entrant with a superior product would be unable to demonstrate its product's superiority and thus would be unable to compete with established but inferior products and would not know, or find it difficult to ascertain, what features and performance are necessary for successful market entry.

36.     Cybersecurity can thus be described as a "market for lemons" where there is an asymmetry of information between the buyer and the seller such that the seller knows of the product's defects but does not disclose them to the buyer or may even misrepresent them to the buyer.  In a market for lemons, the key to consumer protection is independent evaluations by third-parties which inform and therefore empower the consumer.  With the adoption of the AMTSO Testing Standard, the EPP Vendor Conspirators have done the opposite of protecting consumers—they have thwarted the ability of EPP product testers to conduct independent evaluations and alert the public of EPP Security Defects.  In other markets where vendors and customers have asymmetrical access to information, one solution has been the introduction of lemon laws (like the Magnusson Moss Act of 1975) where customers of products that turn out not to work for reasons that could not be determined at purchase can obtain a refund.  Unfortunately, no similar remedy exists for defective cybersecurity products.

**NSS LABS**

37.     NSS Labs began its business performing "public tests" in which NSS Labs tests a number of competing cybersecurity products, assesses their ability to protect computers from cyberattacks, and then distributes a report containing the results of the testing to paying customers, usually including the cybersecurity product companies themselves.  Thus, the purpose of a public test is to provide information regarding the performance of cybersecurity products to users and potential users of those products, as well as to cybersecurity product vendors themselves.  When performing a public test, NSS Labs tests the various vendors at the same time while simulating the same attacks on each product such that each product can be tested and evaluated in the same way.

38.     One of NSS Labs' key competitive advantages is that its tests are considered objective and reliable by customers, potential customers and vendors because while NSS Labs publishes its test methodology, it does not let EPP product vendors dictate how its tests will be performed or know in advance what inputs, malware or other cyberattacks their products will be subjected to.  NSS Labs conducts public tests without charging cybersecurity vendors to participate in these tests.

39.     In or around 2011, one of the largest banks in the world who was (and is) a customer of NSS Labs requested that NSS Labs help one of the bank's cybersecurity vendors fix a fundamental flaw in a firewall product that the bank had purchased.  The flaw had been uncovered by NSS Labs in public testing of that firewall product.  At the bank's request, NSS Labs attempted to help the vendor identify the source of the problem at no charge.  After spending several uncompensated weeks attempting to help identify the source of the problem, NSS Labs advised its bank customer that it could no longer afford to continue to provide its consulting services for free.  The bank then re-emphasized to NSS Labs how important it was to the bank that the flaw be found and fixed, and suggested that NSS Labs charge the firewall product vendor for its services.  The firewall product vendor agreed to pay for NSS Labs' services which allowed the vendor to identify and fix the problem, and out of which NSS Labs' private testing business began.

40.     A "private test" is a test of only a single product's ability to protect computers from cyberattack.  A private test is performed under Non-Disclosure Agreement ("NDA") with the vendor, and NSS Labs reports the results of the private test only to that vendor for its own internal use only.  The purpose of a private test is therefore to reveal to a vendor the security defects in its products, so the vendor may correct them.  At first, private tests were used by cybersecurity product vendors to help identify and fix security defects revealed in public tests.  Subsequently, many cybersecurity product vendors realized that they could avoid poor public test results by subjecting their products to private testing before they were released so security defects could be identified and fixed before product release and public testing.

41.     Both the public tests and private tests that NSS Labs conducts protect consumers in the market for cybersecurity products generally and EPP products specifically by identifying EPP

Security Defects and, in the instance of public tests, making those EPP Security Defects known to consumers.

**CROWDSTRIKE**

42.     CrowdStrike, which began in business in 2011, refers to all of its cybersecurity products as part of its "Falcon Platform" or just "Falcon."

43.     CrowdStrike launched an AEP product in 2016 called "Falcon Host" that CrowdStrike claims "delivers and unifies next-generation antivirus, endpoint detection and response (EDR), managed threat hunting, security hygiene and threat intelligence." A true and correct copy of a print-out from CrowdStrike's website, available at https://www.crowdstrike.com/products, is attached hereto as **Exhibit C**. Falcon Host is a cloud (web) based product.

44.     NSS Labs is informed and believes and thereon alleges that Falcon Host has numerous serious EPP Security Defects that CrowdStrike attempts to conceal from actual and potential customers by attempting to contractually prevent the testing of its product and by its support of the AMTSO Testing Standard in conjunction with the other EPP Vendor Conspirators.

45.     NSS Labs is informed and believes and thereon alleges that CrowdStrike is attempting to conceal its EPP Security Defects in part because of the negative publicity that resulted from the Russian hacking of the Democratic National Committee ("DNC"). In particular, NSS is informed and believes and thereon alleges that according to one indictment of Russian military officers, "CrowdStrike missed a spot, and one computer infected with the [Russian's] malware 'remained on the DNC network until in or around October 2016.'" *See https://www.thedailybeast.com/russian-hackers-kept-dnc-backdoor-longer-than-anyone-knew.* Specifically, CrowdStrike "took steps to exclude [the Russian] intruders from the [DNC's] networks" but "[d]espite these efforts, a Linux-based version of X-Agent, programmed to communicate with the GRU-registered domain linuxkrnl[.]net, remained on the DNC network until in or around October 2016." *Id.*

46.     Rather than acknowledge that it missed the existence of this Russian hacker of EPP Security Defects in its products, "CrowdStrike referred the [press's] inquiry to the DNC." *Id.* NSS Labs is informed and believes and thereon alleges that this refusal to acknowledge responsibility is consistent with CrowdStrike's attempts to conceal EPP Security Defects in its products by preventing

testing of its EPP and AEP products unless it can control the testing by, for example, insisting on adherence to the AMTSO Testing Standard.

47.    Defendant CrowdStrike is and at all relevant times herein has been a member of AMTSO and at various times here relevant one or more of its employees has served on the Executive Committee and/or the Board of Directors of AMTSO.

**SYMANTEC**

48.    Symantec began in business in 1982 and entered the cybersecurity market in 1989 with the introduction of Symantec Antivirus for the Macintosh.  In August 1990 it purchased Peter Norton Computing, and in 1991 introduced Norton Antivirus for personal computers operating the Microsoft operating system.  Since that time all Symantec Antivirus products have been marketed under the Norton Antivirus name.  Symantec offers a variety of EPP platforms, including an AEP product called Symantec Endpoint Protection and Advanced Threat Protection Platform.

49.    Mark Kennedy, who has worked for Symantec since 1991 and is currently a Symantec "Distinguished Engineer," is and has been since 2009 a member of the AMTSO Board of Directors.

**ESET**

50.    ESET offers an AEP product called ESET Endpoint Security.

51.    Righard J. Zwienenberg, a "Senior Research Fellow" of ESET since 2012, served as a "Class 2" member of the AMTSO Board of Directors from 2016 until he resigned around the time that Tony Anscombe, the "Global Security Evangelist and Industry Ambassador" for ESET, delivered a presentation attacking NSS Labs and its CEO in an AMTSO meeting in Portland, Oregon. This May 21, 2018, meeting was the one at which AMTSO decided to put adoption of the AMTSO Testing Standard to a vote of the members of AMTSO.

**AMTSO**

52.    According to AMTSO's website, AMTSO "was founded in 2008 to improve the business conditions related to the development, use, testing and rating of anti-malware products and solutions."

53.     NSS Labs is informed and believes and thereon alleges that most EPP product vendors, including most AEP product vendors, are and at all relevant times herein have been members of AMTSO.

54.     Unlike other organizations that promulgate testing standards, like the famous Underwriters Laboratories where testing and other standard development is open not just to companies who sell (or test) products but to "[a]ll persons directly affected by a [proposed standard]," AMTSO's membership consists principally of cybersecurity companies and only a small number of companies who provide testing services to the cybersecurity companies.  Compare https://ulstandards.ul.com/about/developing-standards/ with https://www.amtso.org/members/.

55.     AMTSO and its Board of Directors largely comprise, and are controlled by, EPP product vendors.

56.     CrowdStrike has had and currently does have a leadership position on both AMTSO's Board of Directors and its "Executive Team."  In particular, Brad Albrecht, CrowdStrike's Senior Director of Technology, is the "Chief Technology Officer" of AMTSO and a member of the AMTSO "Executive Team" which "drives the day-to-day operation of the organization." https://www.amtso.org/the-amtso-team/.

57.     Mr. Albrecht was also elected to a three-year term as a "Class One" director of AMTSO at its most recent election for Board of Directors, which took place from June 5 to June 16, 2018.  Mr. Albrecht's three-year term as a member of the AMTSO Board of Directors began on July 1, 2018.

58.     Symantec currently has, and has had at least since 2009 when Mark Kennedy joined the Board, a representative on the AMTSO Board of Directors.

59.     ESET had a representative on the AMTSO Board of Directors from June 2016 until the May 21, 2018 AMTSO Portland meeting at which both (a) an ESET representative attacked NSS Labs and its CEO's position regarding the draft testing protocol and (b) AMTSO decided to put adoption of the AMTSO Testing Standard to a vote of its members.

60.     While providers of EPP testing services, including NSS Labs, are allowed to and do participate in AMTSO, they constitute a small minority of AMTSO members and are easily outvoted

1   by EPP product vendor members as indeed they were in the adoption of the AMTSO Testing
2   Standard.

3          61.     NSS Labs is informed and believes and thereon alleges that since its founding,
4   AMTSO has directed virtually all its actions at attempting to restrain competition in the testing of
5   EPP products in general and in the "testing and rating of anti-malware products and solutions" in
6   particular, by prescribing rules for the testing of EPP products that are designed to allow EPP product
7   vendors to conceal the EPP Security Defects of their products from actual and potential customers.

8          62.     NSS Labs is informed and believes and thereon alleges that at least as early as 2009,
9   AMTSO and its members began drafting "standards" for "testing and rating of anti-malware products
10  and solutions" that were intended to be imposed on providers of testing services for EPP products,
11  including AEP products.  NSS Labs is informed and believes and thereon alleges that under these
12  draft standards, members of AMTSO were going to be required to deal only with providers of EPP
13  testing services who complied with AMTSO's standards for testing and rating of anti-malware
14  products and solutions and were to be prohibited from dealing with EPP testing services that did not
15  comply with AMTSO's standards.  NSS Labs is informed and believes and thereon alleges that
16  AMTSO abandoned these original proposed standards due to antitrust concerns but later reinitiated
17  efforts to implement standards that eventually became the current AMTSO Testing Standard.

18         63.     For example, in August 2016, AMTSO engaged in an internal email discussion among
19  its members in which CrowdStrike, through Dimitri Alperovitch and Don Larson, and Symantec,
20  through at least Mark Kennedy, participated, concerning the terms on which access to
21  VirusTotal.com, the leading platform for sharing malware (so it can be detected and blocked), should
22  be available to EPP vendors.  The AMTSO EPP vendor members and AMTSO itself agreed, among
23  other things, that access should only be available to EPP vendors who are AMTSO members and
24  whose products are only tested by EPP testing services  who are also AMTSO members.  In addition,
25  both the EPP vendors and the EPP Testing services would be required to have agreed to adhere to
26  AMTSO's "Fundamental Principles of Testing" available at https://www.amtso.org/wp-
27  content/uploads/2018/05/AMTSO-Fundamental-Principles-of-Testing-FINAL.pdf,   and   to   the
28  AMTSO Testing Standard once adopted.  This discussion was designed to bolster the Conspirators'

efforts to restrain trade in the Relevant Markets (as defined below) by restricting access to VirtusTotal.com, access to which is essential effectively to compete in the Relevant Markets.

**THE CONSPIRACY**

64.     NSS Labs is informed and believes and thereon alleges that CrowdStrike, Symantec and ESET conspired with each other and the other EPP Vendor Conspirators to license their products under terms of use or end user license restrictions that purport to prevent competitive or comparative testing of their products, and purport to prohibit their customers from allowing their copies or "instances" of EPP products to be used for competitive or comparative testing.

65.     NSS Labs is informed and believes and thereon alleges that at the RSA Security Conference held in San Francisco California on February 13-17, 2017, CrowdStrike, through its Chief Technology Officer, Dimitri Alperovitch, organized a meeting of the EPP Vendor Conspirators with the express intent, purpose and effect of obtaining agreement among the competitors to refuse to do business with companies, including specifically NSS Labs, who attempt to perform public tests of their products using testing methodologies other than those agreed to by the EPP Vendor Conspirators and embodied in the AMTSO Testing Standard.

66.     The EPP Vendor Conspirators agreed that defendant AMTSO would adopt "standards" for "testing and rating of anti-malware products and solutions," that adherence to such standards would be mandatory at least among the EPP Vendor Conspirators, and that at least the EPP Vendor Conspirators would refuse to deal with any cybersecurity testing service that did not adhere to the testing "standards" to be adopted by AMTSO.

67.     In the months preceding the vote on adoption of the AMTSO Testing Standard, AMTSO announced on or about October 19, 2017, that "[t]o ensure this documentation [relating to the proposed AMTSO Testing Standard] remains reasonably private to the AMTSO community, we are implementing access restrictions on some areas of the AMTSO website." Thus AMTSO took specific actions to prevent non-AMTSO members, including actual and potential customers for EPP products, from learning about the proposed AMTSO Testing Standard.

68.     Shortly thereafter, a debate arose among the AMSTO members about whether the votes in favor or opposed to its adoption should be public. Several EPP testing services companies

expressed the view that the votes should be confidential (secret).  AMTSO itself (through its president and CEO, Denis Batchelder) strongly favored a public vote.  While AMTSO board member Mark Kennedy of Symantec was adamant in his communications with the AMTSO membership that the vote should be public, the AMTSO representative of one EPP vendor member expressed why the vote should be secret:  "Hearing all the opinions, I think secret ballot is better.  With open ballot, there are chances of using information on someone's positions outside of the intended purpose of developing a standard.  Debates on the issues are being done in open already where anyone can voice their opinions.  Secret ballot also will anyone from just 'following the crowd' of the fear of intimation of voting against a majority which may be known in open ballot."  Notwithstanding the request by the EPP testing services AMTSO members that the vote be secret for reasons including those expressed above by the EPP vendor member of AMTSO, the vote was in fact public.

69.     On or about December 4, 2017, one of the EPP testing services company members of AMTSO [not NSS Labs] sent an email to the AMTSO membership stating that some EPP vendor members had threatened it with litigation if it tested their products over their objections.  In the email the testing service company member of AMTSO wrote:  "But the main victims [of EPP vendors seeking to prohibit testing] are the customers in a case like this. Testing is hard and complex. We don't know how to do a perfect test. We do believe customers should test the product themselves the same as they rely on professional testers. But whenever vendors provide the inexperienced customer a flawed methodology to test with and meanwhile professional testers are prohibited from independently testing a product, there will be no winners on the long run.  Our questions are the following:  (1) Is it ethical behavior to reply to a 'test notification' with legal threats, without trying to discuss a solution first? This question applies to both independent and sponsored tests. (2) Should AMTSO allow vendors who are members to threaten labs who are members with legal action to prevent them testing their products? For example threatening them BEFORE they test their products - so they can have no evidence that the lab has or would do anything biased, they just prevent their technology being assessed by any lab they choose. So by definition, they choose who can and who can't test their technology. So a third party (customer) can only have the efficacy of a vendors technology assessed by an AMTSO lab that the vendor chooses."

70.     In response to the EPP testing services company member of AMTSO's email, Ms. Jaimee King, the general counsel of AMTSO, responded, copying all AMTSO members, "You are prohibited from discussing the 'status or substance of any ongoing or threatened litigation.'"

71.     When the EPP testing services company member of AMTSO replied that it was a generic question that did not involve ongoing or threatened litigation, AMTSO board member Mark Kennedy of Symantec responded:  The wording is "ongoing or **threatened** litigation" (emphasis added).

72.     NSS Labs is informed and believes and thereon alleges that the response of AMTSO though its general counsel, and particularly the follow-on response of AMTSO board member Mark Kennedy of Symantec, to the email by the EPP testing services company member of AMTSO in which the entire AMTSO membership was copied was to further the conspiracy among the EPP Vendor Conspirators in an attempt to intimidate EPP testing services companies who would not agree to follow the AMTSO Testing Standard once adopted.

73.     Consistent with, and in furtherance of, the conspiracy amongst the EPP Vendor Conspirators, on May 19, 2018, just before the May 21, 2018 Portland Oregon AMTSO meeting, Mark Kennedy of Symantec sent an email to the AMTSO membership in which he stated, among other things:  "Moreover, Symantec is committed to using the standards for all privately commissioned tests going forward.  That means if you want the money Symantec will pay for those tests, you will have to follow the standards.  If a tester doesn't like that, too bad.  We will find one of their competitors who will.  If an included vendor doesn't like that, put your reasons into the commentary and let the reader weigh your arguments.  We intend to put our money where our vote is.  I encourage all of Symantec's competitors to do the same."  A true and correct copy of the May 19, 2018 email is attached hereto as **Exhibit D**.

74.     NSS Labs is informed and believes and thereon alleges that in response to Mr. Kennedy's email and/or for other reasons, some or all of the EPP Vendor Conspirators announced in an AMTSO meeting in Portland, Oregon on May 21, 2018 their agreement that they will not do business with cybersecurity testing organizations that do not adhere to the AMTSO Testing Standard.

75.     According to the AMTSO website, in May 2018 AMTSO adopted the AMTSO Testing Standard (*see* **Exhibit A**) which it describes as a "standard" for "testing or rating of anti-malware products and solutions" which "specifies the information to communicate and how that information should be communicated between testers and vendors with products or solutions that may be included in public and private tests."  Moreover, it is the "mission" of AMTSO to establish specific rules for "testing behavior within the industry," a mission it fulfilled with the adoption of the AMTSO Testing Standard.

76.     The purpose of the AMTSO Testing Standard is plain on its face—it is aimed at providing the EPP Vendor Conspirators the opportunity to know in advance exactly where, when and how their EPP products will be tested such that the EPP Vendor Conspirators can tailor their products in advance to the threats against which their products will be tested and score better on any public or private test.  But knowing how one's product will be tested in advance defeats the entire purpose of independent third-party testing, no less than a student knowing the questions and answers before a test defeats the entire purpose of a school test.  Indeed, obtaining such knowledge is usually called "cheating."

77.     The goal of the AMTSO Testing Standard is manifest throughout its provisions.  For example, Section 4.1 of AMTSO Testing Standard provides:  "Tester shall provide notification of a Test Plan to all potential Test Subject Vendors" and that the "Test Plan notification shall be made no more than two (2) calendar months, and no less than five (5) Business Days, before the Commencement Date of a Test.  This gives EPP Vendor Conspirators who do not want their products tested the ability to block testing before it has begun.

78.     Section 6.1.1 requires a tester to state in the Test Plan a "stated intent . . . to follow th[e] AMTSO Standard."  Section 6.1.2 requires that the Test Plan reveal the "types of Products that are intended to be included in the Test."  Section 6.1.3 requires the Test Plan to reveal:  "The purpose of the Test, including the type(s) of threats the Test Subjects will be tested against."  Section 6.1.4 requires that the Test Plan reveal the "Commencement Date of the Test, or a range of dates during which the Test may commence."  Section 6.1.6 requires the Test Plan to reveal:  "A clear definition of the methodology of the Test, which shall include a description of the testing environment and what

the Test is intending to achieve."  Section 6.1.7 requires the Test Plan to reveal:  "A statement of intention of Product versions, configurations to be applied, and which functionality of the Products will be tested."  Section 6.1.8 requires the Test Plan to reveal: "An overview of the Test's scoring and certification plan."  Section 6.1.9 requires the Test Plan to reveal: "Instructions on how the Test's results can be disputed." Section 6.1.11 requires the Test Plan to reveal:  "A reasonable amount of information on sample provenance and sample Collection strategy."  Section 6.1.12 requires the Test Plan to reveal:  "A clear description of how samples will be Curated, and how and when feedback will be solicited and processed and what evidence will be provided."  Section 6.4 requires tester to "notify all Test Subject Vendors of any significant changes to previously communicated Test Plans.".

79.   These provisions give the EPP Vendor Conspirators the ability to tailor their products in advance to the threats against which their products will be tested.  These provisions also defeat the purpose of independent third-party testing by giving the EPP Vendor Conspirators the ability to cheat the tests they will be subject to and to give consumers the false impression that EPP products are free from EPP Security Defects when in fact they are not.  Misleading the consumer and the public regarding the effectiveness of cybersecurity products has a direct effect on public safety and the safety of businesses and individuals who rely on EPP products.  These provisions also give the EPP Vendor Conspirators the opportunity to discredit tests that do not provide ahead of time full disclosure of when, where and how the tests will be conducted and allows the EPP Vendor Conspirators to credit only those tests that they deem appropriate.  These provisions also give the EPP Conspirator Vendors the opportunity to discriminate between those testers and tests that provide them with the most favorable results.  These provisions also arm the EPP Vendor Conspirators with a mechanism to intimidate and shun those testers who do not disclose the exact tests they intend to perform prior to running a test.

80.   These provisions serve no purpose other than giving EPP Vendor Conspirators the ability to tailor their products in advance to the threats against which their products will be tested, obviating the entire purpose of objective testing.

81.   Section 9.2.5 further requires EPP testing services to "provide AMTSO with appropriate data to run the compliance confirmation process that is not otherwise included in the

publicly released final Test results, including the Test Plan, Test results, and commentary." This effectively requires EPP testing services to hand over their intellectual property to AMTSO. It also allows AMTSO to keep the EPP Vendor Conspirators informed about which cybersecurity testing companies are in fact adhering to the AMTSO Testing Standard so that adherence to the goals of the conspiracy could be verified.

82.    Adoption of at least the foregoing provisions of the AMTSO Testing Standard allows the EPP Vendor Conspirators to rig in advance the outcome of tests performed by testing services who adhere to the AMTSO Testing Standard because EPP Vendor Conspirators know in advance how their products will be tested. The outcome of the tests therefore will misrepresent to the public the effectiveness of their EPP products and conceal the products' vulnerability to EPP Security Defects.

83.    Consistent with, and in furtherance of, the conspiracy among the EPP Vendor Conspirators, in June 2018, an agenda for an AMTSO meeting concerning the adoption of the AMTSO Testing Standard had as one of only four agenda items: "Driving Adoption: Companies Requiring AMTSO Standards." NSS Labs is informed and believes and thereon alleges that the meeting agenda confirms that Defendants intend that at least the EPP Vendor Conspirators will refuse to deal with cybersecurity testing companies that do not adhere to the AMTSO Testing Standard.

84.    Also consistent with, and in furtherance of, the conspiracy, on or about September 5, 2018, Dennis Batchelder, the President of AMTSO, posted on the AMTSO website a blog which states in part: "We expect to see the first tests reaching full compliance with the AMTSO Standard in the next few weeks, ***and will continue to strongly encourage all testing organizations, and other parties engaging in anti-malware testing, to follow the AMTSO Standard wherever possible***. (Emphasis added.) A true and correct copy of the September 5, 2018 AMTSO blog post is attached hereto as **<u>Exhibit E</u>**.

85.    Yet less than two weeks later, on September 15, 2018, Dennis Batchelder admitted that there were competitive issues in adopting the AMTSO Testing Standard in an email to Mark Kennedy, AMTSO board member from Symantec, discussing potential conflicts around adopting a

different proposed standard:  "We created a standard that applies to testers and vendors [the AMTSO Testing Standard].... that's pretty conflicted, too."

86.     NSS Labs is informed and believes and thereon alleges that the EPP Vendor Conspirators conspired with themselves and AMTSO to refuse to deal with EPP testing companies that do not adhere to the AMTSO Testing Standard.

87.     NSS Labs objected to the AMTSO Testing Standard prior to its adoption and raised concerns about the conflicts of interest of those driving the adoption of the AMTSO Testing Standard and the barriers the AMTSO Testing Standard erects to independent third-party testing of EPP products.

88.     NSS Labs is informed and believes and thereon alleges that other testers of EPP products raised similar concerns.

89.     NSS Labs is informed and believes and thereon alleges that since entering into the conspiracy alleged herein, none of the Defendants ever (a) undertook affirmative steps inconsistent with the object of the conspiracy to disavow or defeat the goal or purposes of the conspiracy; (b) acted in a manner reasonably calculated to notify its coconspirators that it was no longer participating in the conspiracy; or (c) disclosed the conspiracy to law enforcement authorities.  Accordingly, NSS Labs is informed and believes and thereon alleges that each of the Defendants remains fully liable as a co-conspirator whether or not at some point it ceased active participation in the conspiracy.

**RELEVANT MARKETS**

90.     NSS Labs is informed and believes and thereon alleges that the acts as herein alleged affect commerce in four relevant markets.

91.     NSS Labs is informed and believes and thereon alleges that the first relevant market affected by the acts herein alleged is the national market for EPP products (the "EPP Product Market").

92.     NSS Labs is informed and believes and thereon alleges that the second relevant market affected by the acts herein alleged is the national market for AEP products (the "AEP Product Market").

93.     NSS Labs is informed and believes and thereon alleges that the third relevant market affected by the acts herein alleged is the national market for EPP product testing services (the "EPP Testing Market").

94.     NSS Labs is informed and believes and thereon alleges that the fourth relevant market affected by the acts herein alleged is the national market for AEP product testing services (the "AEP Testing Market").

95.     The EPP Product Market, the AEP Product Market, the EPP Testing Market and the AEP Testing Market will be referred to collectively as the "Relevant Markets."

**EFFECT ON INTERSTATE COMMERCE**

96.     The acts herein alleged have an effect on interstate commerce, in particular in the EPP Product Market and the AEP Product Market by (a) restricting information regarding and therefore the quality of EPP products and AEP products; (b) discouraging entry, and therefore keeping prices high, in the EPP Product Market and the AEP Product Market because vulnerabilities in EPP products and AEP products are concealed from consumers, thus discouraging entry of new EPP products and new AEP products because new products cannot compete based on security quality; and (c) keeping prices artificially high in the EPP Product Market and the AEP Product Market by concealing EPP Security Defects from consumers who would demand better performing products at lower prices if the EPP Security Defects were known to them.

97.     The acts herein alleged also have an effect on interstate commerce, in particular in the EPP Testing Market and the AEP Testing Market by preventing competition on quality, and therefore also on price, because all EPP testing companies and AEP testing companies are required to adhere to the AMTSO Testing Standard or else be boycotted by at least the EPP Vendor Conspirators and likely other EPP product members of AMTSO.

**ANTITRUST INJURY**

98.     NSS Labs has suffered antitrust injury as a result of the acts herein alleged because it is the direct and principal target of the concerted refusal to deal/group boycott with EPP Testing companies and AEP Testing companies that do not adhere to the AMTSO Testing Standard.

99.     Because one of NSS Labs' key competitive advantages is that its tests are considered objective and reliable because it does not let EPP product vendors  and AEP product vendors know how its tests will be performed or to what malware or what inputs that are not malware their products will be subjected, NSS Labs is being forced to choose between adhering to the AMTSO Testing Standard and losing its competitive advantage and therefore losing revenue and profits, on the one hand, or not adhering to the AMTSO Testing Standard and having its testing services boycotted by the EPP Vendor Conspirators.

100.     Because NSS Labs has chosen to preserve its competitive advantage by not adhering to the AMTSO Testing Standard, Defendants' acts herein alleged have reduced the value of NSS Labs' public testing because of its inability to test all EPP products and AEP products, including some of the significant EPP products and AEP products on the market whose vendors refuse to deal with testing companies, like NSS Labs, who do not adhere to the AMTSO Testing Standard.  As a result, NSS Labs has lost sales and profits from the sale and license of its public testing reports, including its AEP Group Test reports, because fewer customers purchase reports that do not include all market participants than would purchase reports that included all market participants.

101.     In addition, NSS Labs has lost sales and profits from the sale and license of its public testing reports, including its AEP Group Test reports, because it cannot charge customers who purchase reports that do not include all market participants as much as it could charge for reports that included all market participants.

102.     Further, NSS Labs has lost sales and profits from the sale and license of marketing rights to its public testing reports, including its AEP Group Test reports, because it cannot charge as much for marketing rights to customers which do not include all market participants as it could charge for marketing rights to reports that included all market participants.

103.     Finally, NSS Labs has lost sales and profits from the performance of private testing for both cybersecurity product vendors and their actual and potential customers, for which NSS Labs does charge a fee, because the EPP Vendor Conspirators purport to prohibit even private testing of their products by testing companies who do not adhere to the AMTSO Testing Standard.

## COUNT I

## PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

## (GROUP BOYCOTT)

104.    NSS Labs realleges paragraphs 1-103, inclusive.

105.    Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

106.    Defendants have refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

107.    Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

108.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

109.    Defendants' refusal to deal affected interstate commerce as herein alleged.

110.    Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing EPP products generally and AEP products in particular as herein alleged.

111.    NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

112.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

113.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

114.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

115.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

116. NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT II

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

### UNDER THE RULE OF REASON

### (GROUP BOYCOTT)

117. NSS Labs realleges paragraphs 1-103, inclusive.

118. Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119. Defendants have refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

120. Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

121. Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

122. Defendants' refusal to deal affected interstate commerce as herein alleged.

123. Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing EPP products generally and AEP products in particular as herein alleged.

124. NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

125. NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

126. NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

127. NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

128.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

129.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT III

## PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

## (BEING DISADVANTAGED BY A MEMBERSHIP ORGANIZATION)

130.    NSS Labs realleges paragraphs 1-103, inclusive.

131.    AMTSO by and through its officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

132.    AMTSO has enacted the anti-competitive AMTSO Testing Standard and encouraged its members to refuse to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

133.    Defendants' refusal to deal was pursuant to an agreement orchestrated by AMTSO.

134.    AMTSO's and Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

135.    AMTSO's acts as herein alleged and Defendants' refusal to deal affected interstate commerce as herein alleged.

136.    AMTSO's acts as herein alleged and Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

137.    NSS Labs was injured in its business or property as a result of AMTSO's acts as herein alleged and Defendants' refusal to deal as herein alleged.

138.    NSS Labs has suffered antitrust injury as a result of AMTSO's unlawful acts as herein alleged.

139.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

140.   NSS Labs seeks an injunction against further wrongful acts of AMTSO pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

141.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

142.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT IV**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

**UNDER THE RULE OF REASON**

**(BEING DISADVANTAGED BY A MEMBERSHIP ORGANIZATION)**

143.   NSS Labs realleges paragraphs 1-103, inclusive.

144.   AMTSO by and through its officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

145.   AMTSO has enacted the anti-competitive AMTSO Testing Standard and encouraged its members to refuse to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

146.   Defendants' refusal to deal was pursuant to an agreement orchestrated by AMTSO.

147.   AMTSO's and Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of Sherman Act, 15 U.S.C. § 1.

148.   AMTSO's acts as herein alleged and Defendants' refusal to deal affected interstate commerce as herein alleged.

149.   AMTSO's acts as herein alleged and Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP

products in particular as herein alleged and AMTSO has no efficiency-increasing justification for the restrictions imposed by the AMTSO Testing Standard.

150.   NSS Labs was injured in its business or property as a result of AMTSO's acts as herein alleged and Defendants' refusal to deal as herein alleged.

151.   NSS Labs has suffered antitrust injury as a result of AMTSO's unlawful acts as herein alleged.

152.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

153.   NSS Labs seeks an injunction against further wrongful acts of AMTSO pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

154.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

155.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT V

### PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

### (USE OF MEMBERSHIP ORGANIZATION TO COMMIT ANTITRUST VIOLATIONS)

156.   NSS Labs realleges paragraphs 1-103, inclusive.

157.   Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

158.   Defendants have used AMTSO to enact the anti-competitive AMTSO Testing Standard and refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

159.   Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

160.   Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

161.   Defendants' refusal to deal affected interstate commerce as herein alleged.

162.   Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

163.   NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

164.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

165.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

166.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

167.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

168.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT VI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

**UNDER THE RULE OF REASON**

**(USE OF MEMBERSHIP ORGANIZATION TO COMMIT ANTITRUST VIOLATIONS)**

169.   NSS Labs realleges paragraphs 1-103, inclusive.

170.   Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

171.   Defendants have used AMTSO to enact the anti-competitive AMTSO Testing Standard and refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO

Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

172.    Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

173.    Defendants' contracts, combinations, and/or conspiracies Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

174.    Defendants' refusal to deal affected interstate commerce as herein alleged.

175.    Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

176.    NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

177.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

178.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

179.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

180.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

181.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT VII

### PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

### AGAINST ONLY AMTSO

### (MEMBERSHIP ORGANIZATION IS INHERENTLY ANTICOMPETITIVE)

182.    NSS Labs realleges paragraphs 1-103, inclusive.

183.    AMTSO is an inherently anti-competitive organization by virtue of its stated purpose, which ultimately led to the adoption of the unlawful AMTSO Testing Standard and, through its members, officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

184.    The existence and operation of AMTSO itself is a *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

185.    AMTSO has disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

186.    NSS Labs was injured in its business or property as a result of AMTSO's existence and conduct as herein alleged.

187.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

188.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

189.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

190.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

191.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT VIII**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

**UNDER THE RULE OF REASON**

**(MEMBERSHIP ORGANIZATION IS INHERENTLY ANTICOMPETITIVE)**

192.    NSS Labs realleges paragraphs 1-103, inclusive.

193.    AMTSO is an inherently anti- competitive organization by virtue of its stated purpose, which ultimately led to the adoption of the unlawful AMTSO Testing Standard and, through its

members, officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

194.   The existence and operation of AMTSO itself unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and there is no efficiency-increasing justification for the existence of AMTSO whose objection is the adoption to anti-competitive restrictions on the testing of EPP products such as those embodied in the AMTSO Testing Standard

195.   AMTSO has disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

196.   NSS Labs was injured in its business or property as a result of AMTSO's existence and conduct as herein alleged.

197.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

198.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

199.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

200.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

201.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT IX

### PER SE VIOLATION OF THE CARTWRIGHT ACT,

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 16720

202.   NSS Labs realleges paragraphs 1-103, inclusive.

203.   Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in

restraint of trade and commerce in violation of the Cartwright Act, California Business and Professions Code § 16720.

204.   NSS Labs is a "person" within the meaning of the Cartwright Act, California Business and Professions Code § 16720.

205.   Defendants' contracts, combinations, and/or conspiracies are *per se* violations of the Cartwright Act, California Business and Professions Code § 16720.

206.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

207.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

208.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

209.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

210.   NSS Labs is automatically entitled to its costs of suit pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

## COUNT X

### VIOLATION OF THE CARTWRIGHT ACT,

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 16720,

### UNDER THE RULE OF REASON

211.   NSS Labs realleges paragraphs 1-103, inclusive.

212.   Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of the Cartwright Act, California Business and Professions Code § 16720.

213.   NSS Labs is a "person" within the meaning of the Cartwright Act, California Business and Professions Code § 16720.

214. Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of the Cartwright Act, California Business and Professions Code § 16720.

215. NSS Labs has suffered antitrust injury as a result of Defendant's unlawful acts as herein alleged.

216. NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

217. NSS Labs seeks an injunction against further wrongful acts of defendants pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

218. NSS Labs is automatically entitled to its reasonable attorney fees pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

219. NSS Labs is automatically entitled to its costs of suit pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

## PRAYER FOR RELIEF

NSS Labs prays for relief as follows:

a) That the Court adjudge and decree that Defendants' acts as herein alleged violate Section 1 of the Sherman Act; 15 U.S.C. § 1;

b) That the Court adjudge and decree that Defendants' acts as herein alleged violate the Cartwright Act, California Business & Professions Code §16720, et seq.;

c) That Defendants, and each of them, and all persons acting in concert with them, be temporarily restrained, preliminarily enjoined and permanently enjoined and restrained from acting pursuant to the agreements herein alleged and from establishing any similar agreement unreasonably restricting competition except as prescribed by the Court;

d) That NSS Labs be awarded damages according to proof, and that such damages be automatically trebled as required by Section 4 of the Clayton Act, 15 U.S.C. § 15 and California Business & Profession Code § 16750(a);

e) That NSS Labs be automatically awarded its attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and California Business & Profession Code § 16750(a);

f)        That NSS Labs be awarded its costs; and

g)        That NSS Labs be awarded such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

NSS Labs demands trial by jury for all issues so triable pursuant to Fed. R. Civ. P. 38(b) and Civil L.R. 3-6(a).

Dated:  September 18, 2018              FEINBERG DAY ALBERTI LIM & BELLOLI LLP

By  /s/ *Ian N. Feinberg*
Ian N. Feinberg

*Attorneys for Plaintiff*
NSS Labs, Inc.