**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NSS LABS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SYMANTEC CORPORATION; ESET, LLC; and ANTI-MALWARE TESTING STANDARDS ORGANIZATION, INC., <br><br> Defendants. | Case No. 18-cv-05711-BLF <br><br> **ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND** <br><br> [Re: ECF 42, 43, 51] |

Plaintiff NSS Labs, Inc. ("NSS Labs") provides cybersecurity testing services for vendors and end users of cybersecurity products. NSS Labs alleges that several vendors, including Defendants Symantec Corporation ("Symantec") and ESET, LLC ("ESET"), conspired with Defendant Anti-Malware Testing Standards Organization ("AMTSO") to exclude NSS Labs from cybersecurity testing markets. NSS Labs sues Symantec, ESET, and AMTSO for violations of federal and state antitrust laws, specifically, Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*.

Each of the Defendants has filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The Court has considered the briefing of the parties and the oral arguments presented at the hearing on May 30, 2019. For the reasons discussed below, the motions are GRANTED WITH LEAVE TO AMEND.

## I. BACKGROUND[1]

*The Parties*

Plaintiff NSS Labs is the world's leading provider of cybersecurity testing services. Compl. ¶ 15, ECF 1. NSS Labs tests cybersecurity products known as Endpoint Protection ("EPP") products, which category includes Advanced Endpoint Protection ("AEP") products. *Id*. ¶¶ 6, 17. EPP products are primarily designed to protect endpoint devices such as personal computers, laptops, and smartphones. *Id.* ¶ 27. AEP products "attempt to continuously monitor threats to file systems" so as to allow users to act against these threats in real-time. *Id*. ¶ 28.

NSS Labs began its business by performing "public tests," in which it tested a number of competing cybersecurity products, assessed the products' abilities to protect from cyberattacks, and then distributed a report to paying customers. Compl. ¶ 37. NSS Labs' customers for public reports include users, potential users, and vendors of the tested products. *Id*. NSS Labs also performs "private tests" for vendors, in which NSS Labs tests a single product under a non-disclosure agreement with the vendor. *Id*. ¶ 40.

Defendants Symantec and ESET are vendors of EPP and AEP products. Compl. ¶¶ 48, 50. Defendant AMTSO holds itself out as a standards setting organization. *Id*. ¶ 52. According to AMTSO's website, it "was founded in 2008 to improve the business conditions related to the development, use, testing and rating of anti-malware products and solutions." *Id*. Most EPP product vendors are members of AMTSO. *Id*. ¶ 53. Symantec, ESET and other EPP product vendors have had representatives serve on AMTSO's Board of Directors. *Id*. ¶¶ 56-59. AMTSO's membership also includes companies that provide EPP testing services, including NSS Labs, but those companies are in the minority and are outvoted by the EPP vendors. *Id*. ¶¶ 54, 60.

*The Alleged Conspiracy*

Symantec, ESET, and other EPP vendors (collectively, "Vendor Conspirators") conspired "to license their products under terms of use or end user license restrictions that purport to prevent

---

[1] The background section is drawn from the allegations of the complaint, documents incorporated into the complaint by reference, and matters subject to judicial notice. *See Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016).

2

competitive or comparative testing of their products, and purport to prohibit their customers from allowing their copies or 'instances' of EPP products to be used for competitive or comparative testing." Compl. ¶ 64. In February 2017, the Vendor Conspirators met at a conference held in San Francisco, California. *Id*. ¶ 65. The Vendor Conspirators agreed that AMTSO would adopt standards for testing and rating anti-malware products, and that the Vendor Conspirators would refuse to deal with any cybersecurity testing service that did not adhere to those standards. *Id*. ¶ 66.

In May 2018, AMTSO adopted the AMTSO Testing Standard ("the Standard"), which is attached to the complaint as Exhibit A. Compl. ¶ 75 and Exh. A. The Standard does not mandate any particular testing methodology. Compl. Exh. A. Instead, it requires advance disclosure of a test plan to EPP Vendors. Compl. ¶¶ 77-78 and Exh. A. According to NSS Labs, the purpose of the Standard is to let the Vendor Conspirators know in advance exactly how their products will be tested. *Id*. ¶ 76. This gives "Vendor Conspirators the ability to tailor their products in advance to the threats against which their products will be tested." *Id*. ¶ 79. NSS Labs asserts that the Standard is intended to, and does, "defeat the purpose of independent third-party testing by giving the EPP Vendor Conspirators the ability to cheat the tests they will be subject to and to give consumers the false impression that EPP products are free from EPP Security Defects when in fact they are not." *Id*.

On May 19, 2018, Mark Kennedy of Symantec sent an email to AMTSO membership stating that Symantec is committed to using the AMTSO Standard for all privately commissioned tests, and that Symantec will not deal with a testing company that does not follow the Standard. Compl. ¶ 73. On May 21, 2018, at an AMTSO meeting in Portland, Oregon, other Vendor Conspirators announced that they too would refuse to deal with cybersecurity testing companies that do not adhere to the AMTSO Standard. *Id*. ¶ 74. At a June 2018 AMTSO meeting, one of the agenda items was "Driving Adoption: Companies Requiring AMTSO Standards." *Id*. ¶ 83. In September 2018, the president of AMTSO posted to the AMTSO website a blog "strongly" encouraging all testing organizations and other parties engaged in anti-malware testing to follow the AMTSO Standard. *Id*. ¶ 84.

NSS Labs refuses to adhere to the AMTSO Standard, and it continues its practice of testing without giving EPP product vendors advance information about how the tests will be performed. Compl. ¶¶ 99-100. NSS Labs claims that as a result, it is the principal target of a group boycott by the Vendor Conspirators. *Id*. ¶¶ 98-100. The Vendor Conspirators purport to prohibit even private testing of their products unless the testing company adheres to the AMTSO Standard. *Id*. ¶ 103. The Vendor Conspirators have conspired to license their products under terms of use that prevent competitive or comparative testing of their products and prohibit customers from allowing their copies of EPP products to be used for competitive or comparative testing. *Id*. ¶ 64.

*Antitrust Claims*

NSS Labs filed the complaint in this action on September 18, 2018, alleging federal and state law antitrust claims against Symantec, ESET, and AMTSO. Compl., ECF 1. NSS Labs also named EPP Vendor CrowdStrike, Inc. as a defendant, but NSS Labs has voluntarily dismissed CrowdStrike, Inc. pursuant to Federal Rule of Civil Procedure 41(a). Notice of Voluntary Dismissal, ECF 75.

NSS Labs asserts claims for: (1) *Per Se* Violation of Section 1 of the Sherman Act (Group Boycott); (2) Violation of Section 1 of the Sherman Act under the Rule of Reason (Group Boycott); (3) *Per Se* Violation of Section 1 of the Sherman Act (Being Disadvantaged by a Membership Organization); (4) Violation of Section 1 of the Sherman Act under the Rule of Reason (Being Disadvantaged by a Membership Organization); (5) *Per Se* Violation of Section 1 of the Sherman Act (Use of Membership Organization to Commit Antitrust Violations); (6) Violation of Section 1 of the Sherman Act under the Rule of Reason (Use of Membership Organization to Commit Antitrust Violations); (7) *Per Se* Violation of Section 1 of the Sherman Act (Membership Organization is Inherently Anticompetitive); (8) Violation of Section 1 of the Sherman Act under the Rule of Reason (Membership Organization is Inherently Anticompetitive); (9) *Per Se* Violation of the Cartwright Act; and (10) Violation of the Cartwright Act under the Rule of Reason.

Symantec, ESET, and AMTSO seek dismissal of all claims under Rule 12(b)(6).

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

The complaint asserts ten antitrust claims, eight under the Sherman Act § 1 and two under California's Cartwright Act. The claims fall into two categories: *per se* claims based on the alleged conspiracy and group boycott (Claims 1, 3, 5, 7, and 9), and rule of reason claims based on the same conduct (Claims 2, 4, 6, 8, and 10). Defendants contend that both sets of claims are subject to dismissal under Rule 12(b)(6), while NSS Labs asserts that its *per se* and rule of reason claims are pled adequately. When evaluating the adequacy of the pleading, the Court applies federal antitrust law to all claims, including those asserted under the Cartwright Act. "The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, was modeled after the Sherman Act." *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). The parties agree that, for pleading purposes, the Cartwright Act claims rise and fall with the Sherman Act § 1 claims.

### A. Sherman Act § 1

Section 1 of the Sherman Act states that "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce" is illegal. 15 U.S.C. § 1. Because "every commercial agreement restrains trade," whether particular conduct "violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). "Restraints can be unreasonable in one of

two ways." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). "A small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Id*. (internal quotation marks and citation omitted). "Restraints that are not unreasonable *per se* are judged under the rule of reason." *Id*. (internal quotation marks and citation omitted). "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Id*. (internal quotation marks, citation omitted, and alterations omitted).

Before addressing the pleading requirements particular to each of these theories of antitrust liability, the Court takes up the more basic question of whether NSS Labs has alleged enough facts to suggest the existence of a conspiracy. Defendant ESET contends that NSS Labs has not done so, and that all claims against ESET are subject to dismissal on that basis. While framed slightly differently, AMTSO also argues that the complaint alleges no unlawful conduct on its part, and therefore that it cannot be liable under NSS Labs' conspiracy theory. Defendant Symantec has stated expressly that it does not challenge the conspiracy allegations for purpose of its motion to dismiss. Accordingly, the Court first addresses the challenges to NSS Labs' conspiracy allegations raised by ESET and AMTSO, then it turns to all Defendants' motions to dismiss the *per se* claims, and finally it addresses all Defendants' motions to dismiss the rule of reason claims.

**B.     Conspiracy Allegations Against ESET and AMTSO**

In order to defeat a Rule 12(b)(6) motion, a plaintiff asserting Sherman Act § 1 claims must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). It is insufficient to allege the existence of a conspiracy in conclusory terms, or to allege facts that suggesting the mere possibility of a conspiracy. *See id.* The plaintiff must plead "facts that are suggestive enough to render a § 1 conspiracy plausible." *Id*.

**1.     ESET**

ESET argues that the complaint is devoid of allegations that ESET representatives agreed to, or took action in furtherance of, the conspiracy. The Court agrees. NSS Labs alleges that the conspiracy began in February 2017 when CrowdStrike's CTO "organized a meeting of the EPP

6

Vendor Conspirators with the express intent, purpose and effect of obtaining agreement among the competitors to refuse to do business with companies, including specifically NSS Labs, who attempt to perform public tests of their products using testing methodologies other than those agreed to by the EPP Vendor Conspirators and embodied in the AMTSO Testing Standard." Compl. ¶ 65. According to NSS Labs, "[t]he EPP Vendor Conspirators agreed that defendant AMTSO would adopt 'standards' for 'testing and rating of anti-malware products and solutions,' that adherence to such standards would be mandatory at least among the EPP Vendor Conspirators, and that at least the EPP Vendor Conspirators would refuse to deal with any cybersecurity testing service that did not adhere to the testing 'standards' to be adopted by AMTSO." *Id*. ¶ 66. However, the complaint does not allege that ESET representatives were at the February 2017 meeting or voted to adopt the proposed testing standards.

ESET points out that it appears from documents attached to the complaint that ESET was not a member of the AMTSO Standards Working Group that developed the Standard. *See* Compl. Exh. A at 4 (listing of AMTSO Standards Working Group). ESET requests that the Court take judicial notice of information on AMTSO's website showing that, in fact, ESET voted against adoption of the Standard. *See* ESET's RJN Exh. 1, ECF 44-1. The request for judicial notice is granted, as no party disputes ESET's vote and the vote "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

At the hearing, NSS Labs' counsel argued that ESET voted against the AMTSO Standard because ESET wanted a *more* restrictive standard, and therefore that ESET's vote does not undermine the allegation of conspiracy. ESET's desire for a more restrictive standard is not alleged in the complaint. Further, NSS Labs does not explain how ESET's vote against the Standard that was the apparent focus of the conspiracy could give rise to a plausible inference that ESET was part of the conspiracy. "For an agreement to constitute a violation of section 1 of the Sherman Act, a conscious commitment to a common scheme designed to achieve an unlawful objective must be established." *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (internal quotation marks and citation omitted).

7

NSS Labs alleges that the Vendor Conspirators have conspired to license their products under terms of use that prevent competitive or comparative testing of their products and prohibit customers from allowing their copies of EPP products to be used for competitive or comparative testing. *Id*. ¶ 64. ESET points out that the complaint does not allege that *ESET's* EULAs contain such restrictions.

In summary, the complaint contains no facts plausibly suggesting that ESET agreed to or participated in the alleged conspiracy to boycott NSS Labs. All of the claims against ESET are subject to dismissal on that basis as well as on the grounds discussed below.

### 2. AMTSO

AMTSO argues that it is not alleged to have done anything unlawful, as its only relevant conduct was adopting the AMTSO Standard through a vote of its members. The Standard is not mandatory, nor does it address the type of licensing restrictions described by NSS Labs. *See* Compl. Exh. A, Standard. It is entirely unclear from the complaint how AMTSO joined or participated in the alleged conspiracy. AMTSO is not a vendor and it does not hire companies such as NSS Labs to provide testing services. In short, the complaint contains no facts plausibly suggesting that AMTSO agreed to or participated in the alleged conspiracy to boycott NSS Labs. All of the claims against AMTSO are subject to dismissal on that basis as well as on the grounds discussed below.

### C. *Per Se* Claims

Defendants argue that this case does not present the type of circumstances that traditionally have warranted application of the *per se* rule, and they request that the Court dismiss the *per se* claims without leave to amend. AMTSO makes the additional argument that *per se* claims cannot be asserted against it in light of the Standards Development Organization Advancement Act of 2004 ("SDOAA"), 15 U.S.C. § 4302. In opposition, NSS Labs claims that it has alleged a "classic group boycott" falling squarely within the scope of the *per se* rule, and that the SDOAA does not prohibit application of the *per se* rule with respect to AMTSO.

#### 1. Circumstances Traditionally Warranting Application of *Per Se* Rule

Exactly what kinds of activity fall within the *per se* rule is "far from certain." *Nw.*

8

*Wholesale Stationers*, 472 U.S. at 293. Defendants argue that cases in which the Supreme Court has applied a *per se* approach generally have involved joint efforts to disadvantage competitors by denying them suppliers or customers needed to compete. For example, in *Fashion Originators' Guild of America, Inc. v. FTC,* the Supreme Court applied the *per se* rule when dress and textile manufacturers who sold original designs agreed to boycott retailers that dealt with manufacturers who sold copies of those original designs. 312 U.S. 457 (1941). While the manufacturers boycotted retailers, with whom they had a vertical relationship, the purpose of the boycott was to injure competitors – manufacturers who sold copies. *Id.* at 467. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, the Supreme Court applied the *per se* rule to a boycott created when a retail store, Broadway-Hale, obtained agreement from manufacturers and distributors of household appliances that they would not sell (or would sell only at discriminatory prices) to Broadway-Hale's competitor, Klor's. 359 U.S. 207, 208-09 (1959). As Defendants point out, NSS Labs is not a competitor of any Defendant.

NSS Labs contends that a *per se* illegal boycott need not be aimed at a competitor, citing *F.T.C. v. Superior Court Trial Lawyers Ass'n*. In *Trial Lawyers Ass'n*, "a group of lawyers agreed not to represent indigent criminal defendants in the District of Columbia Superior Court until the District of Columbia government increased the lawyers' compensation." 493 U.S. 411, 414 (1990). The lawyers, who were in private practice, were appointed and compensated pursuant to the District of Columbia Criminal Justice Act ("CJA"). *Id*. at 415. The Supreme Court held that the lawyers' "boycott constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act," observing that "[t]he agreement among the CJA lawyers was designed to obtain higher prices for their services and was implemented by a concerted refusal to serve an important customer in the market for legal services and, indeed, the only customer in the market for the particular services that CJA regulars offered." *Id*. at 422-23 (internal quotation marks and citation omitted). Characterizing the CJA lawyers' conduct as "the essence of price-fixing," the Supreme Court concluded that "[t]he horizontal arrangement among these competitors was unquestionably a 'naked restraint' on price and output." *Id*. at 423.

While *Trial Lawyers Ass'n* demonstrates that the *per se* rule may be applied where the

9

conspiracy does not target a direct competitor, it involved a price-fixing cartel and thus presented factual circumstances very different from those at issue in this action. NSS Labs has not cited, and the Court has not discovered, any case in which the *per se* rule has been applied to conduct centered on standard setting activities such as those alleged here. At least one court in this district has held that "SSO's are not illegal per se and often create a net pro-competitive effect. . . . Accordingly, any alleged agreement among the members of a SSO is analyzed under a rule of reason." *Analogix Semiconductor, Inc. v. Silicon Image, Inc.*, No. C 08-2917 JF PVT, 2008 WL 8096149, at *4 (N.D. Cal. Oct. 28, 2008).

Recognizing that "there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine," the Supreme Court in *Nw. Wholesale Stationers* offered guidance by identifying three characteristics that are indicative of a *per se* illegal boycott. *Nw. Wholesale Stationers*, 472 U.S. at 294 (internal quotation marks, citation, and alterations omitted). The Ninth Circuit has summarized those three characteristics as follows: "(1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998) (summarizing *Nw. Wholesale Stationers*). "[A] concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Nw. Wholesale Stationers*, 472 at 295. Defendants argue NSS Labs' *per se* claims possess *none* of the three characteristics articulated above. Defendants focus primarily on the third characteristic, arguing that the AMTSO Standard reveals a plausible efficiency justification on its face that makes application of the *per se* rule inappropriate. However, Defendants also argue that the complaint lacks facts showing that Defendants cut off NSS Labs' access to a necessary facility or market, or that Defendants have a dominant position in any relevant market.

### a. Plausible Efficiency Justification

Defendants argue that a plausible efficiency justification for the AMTSO Standard appears from the document itself. The Forward to the Standard states that "AMTSO is a non-profit

10

organization established to help improve the business conditions related to the development, use, testing, and rating of anti-malware solutions." Standard at 3, Exh. A to Compl., ECF 1-1. The Forward goes on to discuss the critical nature of anti-malware testing, and articulates the view that "the lack of proper testing protocols can create unnecessary expense for vendors, which ultimately can impact the amount of resources devoted to research and development, and shift focus from critical threat detection toward compliance with opaque or unfair testing procedures." *Id*. The Forward states that it is "based on a premise that although testers and vendors must retain their independence, anti-malware testing is more likely to be transparent and Fair if there is communication between the parties regarding the solution being tested, and the testing methodology." *Id*.

The justification for adoption offered in the Forward to the Standard is plausible on its face. Under the applicable authorities, that alone appears to doom the *per se* claims. "When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate, and the rule of reason applies." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003). "This is so because plausible arguments that a practice is procompetitive make [the court] unable to conclude 'the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.'" *Id.* (quoting *Nw. Wholesale Stationers*, 472 U.S. at 294).

NSS Labs argues that the justification set forth in the Standard's Forward cannot be accepted at face value but must be evaluated on a more developed record. NSS Labs points out that in *Paladin* the determination whether a *per se* approach was appropriate was made at summary judgment and not on a first round motion to dismiss. *See Paladin,* 328 F.3d at 1155. While NSS Labs is correct as to the procedural posture of *Paladin*, it is not apparent from the decision that the Ninth Circuit's discussion of the plausible efficiency justification turned on any particular evidence in the record. The Ninth Circuit found that a *per se* approach is inappropriate when a defendant "advances" a plausible efficiency justification. *See id.* At least one district court in the Northern District of California has applied that reasoning to preclude *per se* claims at the motion to dismiss stage, finding that a policy enacted by eBay, Inc. regarding the auctioning of

11

coins on its website arguably was pro-competitive and thus that a *per se* approach was inappropriate. *See Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060, at *5 (N.D. Cal. Mar. 8, 2011). Other district courts, however, have declined to determine the applicability of the *per se* rule on a motion to dismiss, finding "that decision is more appropriate on a motion for summary judgment." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012).

This Court concludes that because the *per se* claims in this case turn on enactment of a Standard which articulates plausible pro-competitive justifications on its face, dismissal is appropriate at the motion to dismiss stage. NSS Labs argues that its *per se* claims are not grounded wholly in the enactment of the Standard, but also in the EPP Vendors' agreement to boycott testing companies that refuse to comply with the Standard. NSS Labs also argues that the proffered pro-competitive justification actually is *not* plausible because there is no legitimate reason for EPP Vendors to control how their products are tested.

The separation between the enactment of the Standard and the alleged agreement to boycott is not apparent to the Court upon a reading of the complaint. The Court reads the complaint to allege that the Vendor Conspirators conceived of a scheme to enact a standard for the purpose of restricting testing of their products, and thereafter used the resulting AMTSO Standard as a justification to boycott NSS Labs. It may be that NSS Labs can clarify its theory to show anticompetitive conduct not grounded in the Standard, and to allege facts demonstrating that the justification articulated in the Forward to the Standard is not plausible. As presently framed, however, the Court reads the *per se* claims to be firmly grounded in a non-mandatory standard, which was passed by AMTSO's members in what appears to have been a legitimate vote, and which articulates a plausible efficiency justification on its face.

### b. Access / Market Power

Defendants argue that NSS Labs also has failed to allege facts showing the existence of the first two characteristics listed above, specifically, that NSS Labs was denied access to a supply, facility, or market necessary to enable the victim firm to compete, or that Defendants hold a dominant position in any relevant market. Defendants' argument on these points is well-taken,

12

and is not refuted by NSS Labs. As noted above, it appears from the face of the complaint and attached documents that the Standard is voluntary. NSS Labs is not required to adhere to the Standard, nor are its customers. NSS Labs appears to argue that it needs access to test all anti-malware products on the market in order to provide accurate results to its customers. However, it is unclear from the complaint that Defendants deprived NSS Labs of such access. While NSS Labs suggests that Defendants' EULAs restrict access to their products such that NSS Labs does not have access to Symantec and ESET products even for public testing, NSS Labs does not allege any specific facts to support that suggestion. Moreover, it is entirely unclear whether Symantec and ESET together make up 1% or 100% of NSS Labs' potential customer base among EPP Vendors. It therefore is unclear what effect, if any, a boycott by Symantec and ESET would have on NSS Labs. AMTSO is not alleged to participate in or hold a dominant position in any market.

    **c. Conclusion**

Because it has failed to allege facts showing the existence of any of the three characteristics that are indicative of a *per se* illegal boycott, the Court concludes that NSS Labs has failed to allege a *per se* claim. While Defendants urge the Court to dismiss the *per se* claims without leave to amend, the Court is reluctant to do so without granting NSS Labs the opportunity to clarify its *per se* theories and attempt to cure the deficiencies noted herein. Accordingly, Defendants' motions to dismiss the *per se* claims are GRANTED WITH LEAVE TO AMEND.

   **2. SDOAA**

Defendant AMTSO argues that the *per se* claims against it are barred by the Standards Development Organization Advancement Act of 2004 ("SDOAA"), 15 U.S.C. § 4302. That statute provides in relevant part that, in any antitrust action under federal or state law, the conduct of "a standards development organization while engaged in a standards development activity, shall not be deemed illegal *per se*; such conduct shall be judged on the basis of its reasonableness, taking into account all relevant factors affecting competition, including, but not limited to, effects on competition in properly defined, relevant research, development, product, process, and service markets." 15 U.S.C. § 4302 (2). Defendants Symantec and ESET argue that even if the SDOAA does not bar the *per se* claims against them on its face, the statute should be extended to cover

them as AMTSO's members.

In opposition, NSS Labs argues that AMTSO is not a true standards setting organization covered by the SDOAA. After the hearing, the United States filed a Statement of Interest urging the Court not to dismiss NSS Labs' *per se* claims pursuant to the SDOAA. *See* Gov't's Statement of Interest, ECF 91. The Government argues that there are factual questions whether AMTSO is a standards development organization falling within the SDOAA. The Court granted Defendants leave to respond to the Government's Statement of Interest. *See* Order Granting Leave, ECF 94. Symantec and AMTSO filed responses; ESET did not.

After reviewing the Government's Statement of Interest and the responses thereto, the Court concludes that there may be factual issues as to whether the SDOAA applies in this case. The AMTSO Standard does not proscribe any particular testing methodology but rather focuses on what information must be exchanged between the testing company and the vendor. The Court need not make any determination regarding the application of the SDOAA at this time, however, because NSS Labs' *per se* claims are subject to dismissal on other grounds, as discussed above.

### D. Rule of Reason Claims

Under the rule of reason, a plaintiff must plead four separate elements: (1) the existence of a conspiracy, (2) the intention on the part of the co-conspirators to harm or restrain competition, (3) actual injury to competition, and (4) that the plaintiffs suffered "antitrust injury" as a result of the conspiracy. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). Defendants attack NSS Labs' pleading with respect to the first, third, and fourth elements.

#### 1. Existence of Conspiracy

As discussed above, both ESET and AMTSO successfully challenge the sufficiency of NSS Labs' conspiracy allegations. The complaint does not allege facts showing that ESET's representatives were at the February 2017 where the conspiracy allegedly began, were involved in creating the AMTSO Standard, or even voted for the Standard. The complaint likewise contains no facts plausibly suggesting that AMTSO agreed to or participated in the alleged conspiracy to boycott NSS Labs.

14

### 2. **Injury to Competition**

"Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market and to show the effects upon competition within that market." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988). "That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description." *Oltz*, 861 F.2d at 1446. "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id*.

Symantec and ESET argue that NSS Labs has not stated enough facts to plausibly establish a relevant product market or power within the market. AMTSO does not focus on the relevant product market in its motion.

*Relevant Market*

In *Newcal*, the Ninth Circuit discussed three factors, drawn from *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), that must be considered in assessing a plaintiff's definition of the relevant market. *See Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). First, "the relevant market must be a product market." *Id*. at 1045. Second, "the market must encompass the product at issue as well as all economic substitutes for the product." *Id*. As noted by the Supreme Court in *Brown Shoe*, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Third, "although the general market must include all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket." *Newcal*, 513 F.3d at 1045. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka*, 252 F.3d at 1063; *see also* Newcal, 513 F.3d at 1045 ("[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable.").

The complaint alleges four product markets in the United States, referred to collectively herein as the "Relevant Product Markets": (1) national market for EPP products, (2) national

15

market for AEP products, (3) national market for EPP product testing, and (4) national market for AEP product testing. Compl. ¶¶ 90-95. Thus, the first of the *Brown Shoe* factors is satisfied. However, the second factor is not satisfied, because NSS Labs fails to identify the economic substitutes for the product markets. Nor does NSS Labs plead any facts regarding the cross-elasticity of demand between the Relevant Product Markets and their substitutes. NSS Labs also does not distinguish between any general or submarkets in its complaint. Accordingly, even applying a liberal pleading standard, NSS Labs has failed to allege the relevant markets.

*Market Power*

To establish the effects on competition within a relevant product market, the moving party must allege market power. *Newcal*, 513 F.3d at 1044. NSS Labs has not alleged any facts with respect to Defendants' market power in the Relevant Product Markets.

### 3. Antitrust Injury

Only those who possess antitrust standing by virtue of having suffered antitrust injury may bring a private action for damages for violation of the antitrust laws. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003). Plaintiff must allege harm to competition in the market and cannot succeed by merely showing harm to itself as a competitor. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012). There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Symantec and AMTSO argue that NSS Labs has not alleged facts showing antitrust injury. They argue that even if NSS Labs has suffered an injury, there has been no harm to competition. AMTSO also asserts that any injury suffered by NSS Labs does not flow from unlawful conduct on the part of AMTSO.

NSS Labs alleges that it has suffered an antitrust injury due to Defendants' actions because it has suffered a group boycott and lost revenue based on its refusal to adhere to the AMTSO Standard. Compl. ¶¶ 98–103. NSS Labs does not link its alleged loss of revenue to conduct that

16

also harms competition. NSS Labs argues that competition is harmed by EPP Vendors' EULAs restricting access to their products for testing, suggesting that NSS Labs does not have access to Symantec and ESET products even for public testing. Those facts are not alleged in the complaint.

With respect to AMTSO, standards setting organizations can run afoul of antitrust laws under certain circumstances, for example, where the standard is a result of coercion. *See Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 505-07 (9th Cir. 2010) (finding that allegations of financial pressure and litigation threats demonstrated improper coercion of a standard-setting body at the motion to dismiss stage); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 496 (1988) (stating that packing a standard-setting organization with paid support to ban a competing product violated antitrust laws). Here, no coercion or similar activity is alleged in the complaint. It appears that the only relevant action AMTSO took was to adopt the Standard at issue pursuant to a vote of its membership. NSS Labs asserts that the Standard is anti-competitive, and causes harm to competition, because under the Standard companies such as NSS Labs are to give EPP Vendors advance notice of the test plan. However, the Standard is voluntary, not mandatory. NSS Labs has made clear on the face of the complaint that it does not adhere to the Standard, that is, that it continues to provide testing without giving EPP Vendors advance notice. NSS Labs therefore has failed to allege how AMTSO's adoption of the Standard itself, as opposed to the EPP Vendors' alleged boycott, has caused it to suffer antitrust injury.

### 4. Conclusion

NSS Labs has failed to state a claim under the rule of reason, because it has failed to allege facts showing: the existence of a conspiracy and participation in such conspiracy by ESET and AMTSO; the relevant markets and Defendants' power within those markets; or antitrust injury. NSS Labs' opposition briefs suggest that NSS Labs can allege additional facts addressing all of these elements. Accordingly, the motions to dismiss are GRANTED WITH LEAVE TO AMEND as to NSS Labs' rule of reason claims.

17

## IV. ORDER

(1) The motions to dismiss are GRANTED WITH LEAVE TO AMEND.

(2) Any amended complaint shall be filed on or before September 12, 2019.

(3) Leave to amend is limited to the deficiencies addressed in this order. NSS Labs may not add new parties or claims without first obtaining leave of the Court.

(4) With respect to any future motions to dismiss, the Court sets the following page limits:

    (a) Defendants collectively are limited to a single main brief of no more than 20 pages. Defendants ESET and AMTSO may, but are not required to, file supplemental briefs of no more than 5 pages each. In no event may the total pages of the moving briefs exceed 30 pages.

    (b) The opposition brief is limited to single brief that shall not exceed the total pages of the moving briefs.

    (c) Defendants collectively are limited to a single reply brief of no more than 15 pages.

Dated: August 13, 2019

BETH LABSON FREEMAN
United States District Judge