IAN N. FEINBERG (SBN 88324)
ifeinberg@feinday.com
M. ELIZABETH DAY (SBN 177125)
eday@feinday.com
MARC BELLOLI (SBN 244290)
mbelloli@feinday.com
HONG LIN (SBN 249898)
hlin@feinday.com
JEREMIAH ARMSTRONG (SBN 253705)
jarmstrong@feinday.com
FEINBERG DAY KRAMER ALBERTI LIM TONKOVICH & BELLOLI LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone: 650.618.4360
Facsimile:  650.618.4368

Attorneys for Plaintiff
NSS Labs, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NSS LABS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>SYMANTEC CORPORATION, ESET, LLC, ANTI-MALWARE TESTING STANDARDS ORGANIZATION, INC. AND DOES 1-50, INCLUSIVE,<br><br>                    Defendants. | CASE NO. 3:18-cv-05711<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, AND THE CARTWRIGHT ACT, CALIFORNIA BUSINESS & PROFESSIONS CODE §16720**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff NSS Labs, Inc. ("NSS Labs") files this First Amended Complaint ("FAC") against Symantec Corporation ("Symantec"), ESET, LLC, ("ESET"), Anti-Malware Testing Standards Organization, Inc. ("AMTSO"), and Does 1-50, inclusive (the "Does") (CrowdStrike, Symantec, ESET, AMTSO and the Does will be collectively referred to as "Defendants") for violations of the Sherman Act, 15 U.S.C. § 1 and the Cartwright Act, California Business & Professions Code §16720. For the convenience of the Court and the parties, NSS Labs attaches a version of this FAC showing the changes from the original complaint as **Exhibit G.**[1]

**THE PARTIES**

1.      Plaintiff NSS Labs is a corporation formed under the laws of the State of Delaware, with its principal place of business located at 3711 S MoPac Expy #400, Austin, TX 78746.

2.      Dismissed defendant CrowdStrike is a corporation formed under the laws of the State of Delaware with places of business located at 150 Mathilda Place Sunnyvale, California 94086 and 15440 Laguna Canyon Rd, Suite 250, Irvine, California.

3.      Defendant Symantec is a corporation formed under the laws of the State of Delaware with its principal place of business at 350 Ellis Street, Mountain View, California 94043.  Symantec may be served through its registered agent, Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      Defendant ESET is a California limited liability company with its principal place of business at 610 West Ash Street, Suite 1700, San Diego, California 92101.  ESET may be served through its registered agent, Alexandra Albro, at the above address.

5.      Defendant AMTSO is a corporation formed under the laws of the State of California with its principal place of business located at 325 Sharon Park Dr., Suite 460, Menlo Park, California. AMTSO may be served with process through its registered agent, Paul Tauber, One Montgomery St, Suite 3000, San Francisco, CA. 94104.  A listing of the members of AMTSO is at https://www.amtso.org/members/.

---

[1] For reader convenience, exhibits added to this First Amended Complaint were given exhibit letters following the letters assigned to exhibits attached to the original complaint.

6.     NSS Labs is informed and believes and thereon alleges that the Does, like Dismissed Defendant CrowdStrike, and Defendants ESET and Symantec, are (a) manufacturers and sellers of a type of cybersecurity product called an Endpoint Protection  Platform ("EPP") product and more specifically a type of EPP Product known as an Advanced Endpoint Protection ("AEP") product; and (b) are members of AMTSO.  "Platforms" and "products" sometimes will be used interchangeably herein, although often vendors refer to a suite of EPP products as a "platform" with a common name, as does CrowdStrike with its Falcon "platform" comprising various Falcon "products."

7.     NSS Labs is informed and believes and thereon alleges that some or all of the Does have a principal place of business in this District, are incorporated in California within this District, may be served with process through a registered agent within this District, and/or are otherwise subject to personal jurisdiction in this District.  NSS Labs may seek leave to amend this complaint to allege the true names of the Does when their identities are ascertained.

8.     Dismissed Defendant CrowdStrike and Defendants Symantec, ESET and the Does will be referred to collectively herein as the "EPP Vendor Conspirators."  The EPP Vendor Conspirators together with AMSTO will be referred to collectively herein as the "Conspirators." or with the exclusion of Dismissed Defendant CrowdStrike, "Defendants."

## JURISDICTION AND VENUE

9.     The agreements and conduct as herein alleged are per se violations of the Sherman Act, 15 U.S.C. § 1 and the Cartwright Act, Cal. Bus. & Prof. Code §16720 or, alternatively, unreasonably restrain trade in violation of those statutes.

10.     Jurisdiction over Counts I through X for violation of the Sherman Act, 15 U.S.C. § 1 is based upon Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.

11.     Jurisdiction over Counts XI and XII for violation of the California Cartwright Act is based upon 28 U.S.C. §1367(a) because they are based upon a common nucleus of operative facts with NSS Labs' federal claims, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

12.     Defendants' acts as herein alleged were within the flow of, were intended to, and do have a substantial effect on the foreign and interstate commerce of the United States.

AMTSO and its members established the "Testing Protocol Standard for the Testing of Anti-Malware Solutions (Version 1.0)" on May 22, 2018 (the "AMTSO Testing Standard"). A true and correct copy of AMTSO Testing Standard is attached hereto as **Exhibit A** and is publicly available at https://www.amtso.org/wp-content/uploads/2018/05/AMTSO-Testing-Protocol-Standard-for-the-Testing-of-Anti-Malware-Solutions-v1.0.pdf. The AMTSO Testing Standard allows AMTSO to exclude competition in testing standards because testing services cannot adhere to an alternative standard that is inconsistent with the AMTSO Testing Standard without being boycotted by the EPP Vendor Conspirators, thus precluding the promulgation of alternative standards.

13.     The EPP Vendor Conspirators had, and acted with, the express intent, purpose and effect of obtaining agreement among competitors to refuse to do business with companies, including specifically NSS Labs, who attempt to perform public tests of their products using testing methodologies other than those agreed to by the EPP Vendor Conspirators and embodied in the AMTSO Testing Standard.

14.     Defendants' acts as herein alleged were entirely or largely conducted by and through their participation in the AMTSO Executive Committee, Board or Directors, and/or working groups in California within this District and, for this reason among others, California law, including the Cartwright Act, applies to Defendants' acts as herein alleged.

**INTRADISTRICT ASSIGNMENT**

15.     Pursuant to Local Rule 3-2(c), this case is subject to district-wide assignment because it is an antitrust action.

**INTRODUCTION**

16.     NSS Labs, the world's leading provider of cybersecurity testing services and other cybersecurity testing services which refuse to adhere to the AMTSO Testing Standard, are direct targets of a conspiracy among the EPP Vendor Conspirators, orchestrated in whole or in part through AMTSO, to (a) restrict competition in the testing of cybersecurity products that are critical to, but often fail at, the protection of computer systems operated by governments, businesses and consumers and therefore (b) restrict competition among the EPP Vendor Conspirators on quality and in particular on the ability of cybersecurity products to protect against "zero-day exploits" as defined by defendant

Symantec as alleged in paragraph 93, *infra*, thus (c) allowing the EPP Vendor Conspirators to restrain competition on quality, deter new entrants and increase or maintain the quality-adjusted prices of their products, which conspiracy is insignificantly different from a conspiracy to increase or maintain prices.

17.     The EPP Vendor Conspirators, by and through AMTSO and otherwise, seek to restrict and have restricted competition in the markets for EPP product testing services and AEP product testing services in which NSS Labs competes by refusing to deal with testing services such as NSS Labs which do not adhere to the AMTSO Testing Standard.

18.     NSS Labs already has suffered substantial damages and irreparable injury flowing from the antitrust injury it suffered as a result of the conspiracy and will suffer further injury, including permanent loss of market share and profits it could have obtained from offering a superior testing service because NSS Labs cannot offer test services and reports that include the products of boycotting EPP vendors and AEP vendors which make its reports less valuable to purchasers of such services and reports than they would be if they were of NSS Labs' high quality and also included all EPP vendors and AEP vendors, unless the acts in furtherance of the conspiracy are enjoined.

19.     Independent testing of cybersecurity products including EPP products and AEP products is essential for customers to have accurate information regarding the quality, i.e., the ability of these products to detect and protect against malware, and therefore the price they should pay for them because few, if any, customers have the ability to accurately test EPP product and AEP products for themselves, and even for those who do have such ability, performing tests on EPP products and AEP products would be cost-prohibitive and take far too much time.

20.     At a minimum, the Conspirators comprise (1) EPP Vendor Conspirators who offer EPP platforms and AEP platforms to customers and (2) AMTSO, an organization whose sole purpose is to adopt testing standards with the intent and understanding that the EPP Vendor members of AMTSO would make the testing standards *de facto* mandatory by boycotting testing services that do not adhere to them. Although EPP and AEP product testers, including NSS Labs, have been members of AMTSO, most of them have sought to prevent the adoption of unlawful testing standards. EPP product testers including NSS Labs, AV-Comparatives, AV-Test and SKD LABS, voiced their

opposition to adoption of the AMTSO Testing Standard in a variety of ways, including through feedback in committee meetings, votes, and formally in a letter to the President of AMTSO sent by NSS on May 19, 2018.  In that letter, NSS Labs stated, among other things:  "Instead of using the Draft Standard to improve product offerings and protect the end user, vendors have repeatedly used it as a tool to demonstrate their dissatisfaction with tests where they have underperformed or with test results that they have been unable to use to support their marketing claims. Although the Draft Standard calls for testers to test any solution, it does little to ensure that vendors cannot block or prevent testers from procuring the product to conduct a test, nor does it prevent vendors from intentionally sabotaging a test. We have observed that the AMTSO forum (currently dominated by vendors) has on more than one occasion attempted to limit what a test may validate and how a test organization may engage.  In short, AMTSO is being used to set the terms by which a test can be conducted instead of being used to set the standards that products should be expected to meet."  A true and correct copy of the May 19, 2018 letter is attached hereto as **Exhibit B**.

21.    NSS Labs voted against adoption of the AMTSO Testing Standard when adoption was put to a vote of the AMTSO membership and is informed and believes and thereon alleges that AV-Comparatives, AV-Test and SKD LABS also voted against adoption of the AMTSO Testing Standard.  NSS is also informed and believes and thereon alleges that other EPP product testers voiced opposition to the adoption of the AMTSO Testing Standard but nevertheless voted for its adoption because EPP Vendor Conspirators threatened not to use their testing services if they voted against adoption of the AMTSO Testing Standard.

22.    The EPP Vendor Conspirators orchestrated their conspiracy in whole or in part through AMTSO which, at their behest, adopted the AMTSO Testing Standard.  Among other things, the AMTSO Testing Standard "provides testing protocol and behavior expectations for testers and vendors relating to the testing of anti-malware solutions.  It specifies the information to communicate and how that information should be communicated between testers and vendors with products or solutions that may be included in public and private tests."  *See* **Exhibit A**.

23.    Moreover, the EPP Vendor Conspirators agreed to (a) refuse to deal with and (b) boycott any EPP testing company seeking to test or testing EPP and AEP products that does not agree

to adhere to the AMTSO Testing Standard.  As set forth in further detail below, such behavior is per se illegal under the relevant antitrust laws or, at a minimum, unreasonably restrains competition in the relevant markets defined below.

24.     The EPP Vendor Conspirators agreed among themselves at least as early as February 2016 that they would only allow their products to be tested by EPP testing companies who would adhere to the AMTSO Testing Standard once adopted (and to the policies reflected in the AMTSO Testing Standard even before it was adopted) and would not allow their products to be tested by testing companies like NSS Labs that did not adhere to the AMTSO Testing Standard or the policies it reflected.

25.     AMTSO states that "[t]he AMTSO Testing Protocol Standard provides testing protocol and behavior expectations for testers and vendors relating to the testing of anti-malware solutions."  https://www.amtso.org/standards/  The AMTSO Testing Standard does not, however, facilitate consumer or  other evaluation of cybersecurity products, which it could no more do  than a classroom test could facilitate teacher evaluation of student performance if the questions were distributed in advance.  There is no pro-competitive justification for the AMTSO Testing Standard because it does not advance compatibility, interoperability, consumer safety or any other pro-competitive basis for standardization, including facilitating consumer comparison of tested products.  Rather, AMTSO and the AMTSO Testing Standard exist solely to enable EPP Vendors to avoid competition on quality and quality-adjusted price with no offsetting benefits to competition.

## BACKGROUND FACTS

## CYBERSECURITY AND CYBERSECURITY PRODUCTS

26.     According to the Department of Homeland Security, "Our daily life, economic vitality, and national security depend on a stable, safe, and resilient cyberspace.  Cyberspace and its underlying infrastructure are vulnerable to a wide range of risks stemming from both physical and cyber threats and hazards.  Sophisticated cyber actors and nation-states exploit vulnerabilities to steal information and money and are developing capabilities to disrupt, destroy, or threaten the delivery of essential services.  On May 16, 2018, the Department of Homeland Security released a strategy to provide the Department with a framework to execute our cybersecurity responsibilities during the next

five years to keep pace with the evolving cyber risk landscape by reducing vulnerabilities and building resilience; countering malicious actors in cyberspace; responding to incidents; and making the cyber ecosystem more secure and resilient."  https://www.dhs.gov/topic/cybersecurity.

27.     Cybersecurity is the activity, process, ability or capability to protect communications systems and the information contained from and/or defend against damage, unauthorized use, modification or exploitation of that system or the information contained therein.  More specifically, cybersecurity, computer security or IT security is the protection of computer systems from theft of or damage to their hardware, software or electronic data, as well as from disruption or misdirection of the services they provide.  Cybersecurity includes protecting against harm that may be caused by malicious data and code injection. With increasing reliance on computer systems, the Internet and wireless networks such as Bluetooth and Wi-Fi, and due to the growth of "smart" devices and the various tiny devices that constitute the Internet of Things, cybersecurity is of growing importance.

28.     As described above, one category of cybersecurity product is EPP products.  These products are primarily designed for protecting endpoint devices (such as personal computers, laptops, smartphones and tablets) in an enterprise or consumer IT environment.

29.     An AEP product is one type of an EPP product.  AEP products attempt to continuously monitor threats to file systems and provide end-to-end visibility into threats for the end user/enterprise, which allows users to take action against threats in real time.  Continuous monitoring is performed through constant analysis of suspicious code, identification of communications with malicious hosts, detection of post-infection movements within networks, and secondary compromises that occur within an enterprise network. AEP products are promoted  as being capable of providing enhanced detection of and protection from malware, exploits, zero-day exploits, and several classes of blended threats.

30.     NSS Labs is informed and believes and thereon alleges that despite their use of cybersecurity products, in 2017 more than half of all companies experienced one or more successful cyberattacks that compromised data and/or IT infrastructure.

**VULNERABILITES IN EPP PRODUCTS**

31.     In computer security, a vulnerability is a specific weakness that renders a computer

system open to exploitation by a given threat or susceptible to a given hazard by an attacker who is able to perform unauthorized actions within a computer system and/or to prevent the performance of authorized actions within a computer system.

32.     One type of threat to cybersecurity is "malware."   Malware is any software intentionally designed to cause damage to a computer, server or computer network after it is implanted or introduced in some way into a computer.  It can take the form of executable code, scripts and active content.  Other software often takes the form of computer viruses, worms, Trojan horses, ransomware, spyware, adware and scareware, among others.  Malware has a malicious intent, acting against the interest of the computer user, and thus is distinguishable from a "software bug."

33.     Endpoints such as personal computers, laptops, tablets and smartphones often have vulnerabilities to cyberattacks, including malware.  Unfortunately, EPP products, which are intended to protect endpoints from cyberattacks, often fail to do so, which leave endpoints they are supposed to protect open to certain cyberattacks ("EPP Security Defects").

34.     In NSS Labs' experience, EPP vendors, including AEP vendors, frequently make unsubstantiated and/or overstated claims about the lack of EPP Security Defects in their products and therefore the ability of their products to detect, prevent, or remediate cyberattacks perpetrated by criminals and state actors.   In fact, in NSS Labs' experience, most EPP products, including AEP platforms, do not live up to their performance claims and, even when they do literally live up to their performance claims, the protections are often so limited that they can be evaded.

35.     Thus, it is essential for customers and potential customers of EPP products, including AEP products, to have access to accurate and unbiased tests of EPP products that are not controlled or directed by the EPP product companies themselves since customers and potential customers generally have no ability to evaluate the performance of EPP products for themselves.

36.     Moreover, access to accurate and unbiased tests of EPP products that are not controlled or directed by EPP product companies themselves is also necessary to encourage new entrants and existing vendors to improve their products.  This is because, without such accurate and unbiased tests, a potential entrant with a superior product would be unable to demonstrate its product's superiority and thus would be unable to compete with established but inferior products and

would not know, or find it difficult to ascertain, what features and performance are necessary for successful market entry.

37.     Cybersecurity can thus be described as a "market for lemons" where there is an asymmetry of information between the buyer and the seller such that the seller knows of the product's defects but does not disclose them to the buyer or may even misrepresent them to the buyer.  In a market for lemons, the key to consumer protection is independent evaluations by third-parties which inform and therefore empower the consumer.  With the adoption of the AMTSO Testing Standard, the EPP Vendor Conspirators have done the opposite of protecting consumers—they have thwarted the ability of EPP product testers to conduct independent evaluations and alert the public of EPP Security Defects.  In other markets where vendors and customers have asymmetrical access to information, one solution has been the introduction of lemon laws (like the Magnusson Moss Act of 1975) where customers of products that turn out not to work for reasons that could not be determined at purchase can obtain a refund.  Unfortunately, no similar remedy exists for defective cybersecurity products.

**NSS LABS**

38.     NSS Labs began its business performing "public tests" in which NSS Labs tests a number of competing cybersecurity products, assesses their ability to protect computers from cyberattacks, and then distributes a report containing the results of the testing to paying customers, usually including the cybersecurity product companies themselves.  Thus, the purpose of a public test is to provide information regarding the performance of cybersecurity products to users and potential users of those products, as well as to cybersecurity product vendors themselves.  When performing a public test, NSS Labs tests the various vendors at the same time while simulating the same attacks on each product such that each product can be tested and evaluated in the same way.

39.     One of NSS Labs' key competitive advantages is that its tests are considered objective and reliable by customers, potential customers and vendors because while NSS Labs publishes its test methodology, it does not let EPP product vendors dictate how its tests will be performed or know in advance what inputs, malware or other cyberattacks their products will be subjected to.  NSS Labs conducts public tests without charging cybersecurity vendors to participate in these tests.

40.     In or around 2011, one of the largest banks in the world who was (and is) a customer of NSS Labs requested that NSS Labs help one of the bank's cybersecurity vendors fix a fundamental flaw in a firewall product that the bank had purchased.  The flaw had been uncovered by NSS Labs in public testing of that firewall product.  At the bank's request, NSS Labs attempted to help the vendor identify the source of the problem at no charge.  After spending several uncompensated weeks attempting to help identify the source of the problem, NSS Labs advised its bank customer that it could no longer afford to continue to provide its consulting services for free.  The bank then re-emphasized to NSS Labs how important it was to the bank that the flaw be found and fixed, and suggested that NSS Labs charge the firewall product vendor for its services.  The firewall product vendor agreed to pay for NSS Labs' services which allowed the vendor to identify and fix the problem, and out of which NSS Labs' private testing business began.

41.     A "private test" is a test of only a single product's ability to protect computers from cyberattack.  A private test is performed under Non-Disclosure Agreement ("NDA") with the vendor, and NSS Labs reports the results of the private test only to that vendor for its own internal use only. The purpose of a private test is therefore to reveal to a vendor the security defects in its products, so the vendor may correct them.  At first, private tests were used by cybersecurity product vendors to help identify and fix security defects revealed in public tests.  Subsequently, many cybersecurity product vendors realized that they could avoid poor public test results by subjecting their products to private testing before they were released so security defects could be identified and fixed before product release and public testing.

42.     Both the public tests and private tests that NSS Labs conducts protect consumers in the market for cybersecurity products generally and EPP products specifically by identifying EPP Security Defects and, in the instance of public tests, making those EPP Security Defects known to consumers.  NSS Labs already has suffered substantial damages flowing from the antitrust injury it suffered as a result of the conspiracy, including loss of market share and profits it could have obtained from offering a superior testing service because NSS Labs cannot offer test services and reports that include the products of boycotting EPP Vendors which make its reports less valuable to purchasers

of such reports than they would be if they were of NSS Labs' high quality and also included all EPP Vendor.

### CROWDSTRIKE

43.    CrowdStrike, which began in business in 2011, refers to all of its cybersecurity products as part of its "Falcon Platform" or just "Falcon."

44.    CrowdStrike launched an AEP product in 2016 called "Falcon Host" that CrowdStrike claims "delivers and unifies next-generation antivirus, endpoint detection and response (EDR), managed threat hunting, security hygiene and threat intelligence." A true and correct copy of a print-out from CrowdStrike's website, available at https://www.crowdstrike.com/products, is attached hereto as **Exhibit C**. Falcon Host is a cloud (web) based product.

45.    NSS Labs is informed and believes and thereon alleges that Falcon Host has numerous serious EPP Security Defects that CrowdStrike attempts to conceal from actual and potential customers by attempting to contractually prevent the testing of its product and by its support of the AMTSO Testing Standard in conjunction with the other EPP Vendor Conspirators.

46.    NSS Labs is informed and believes and thereon alleges that CrowdStrike is attempting to conceal its EPP Security Defects in part because of the negative publicity that resulted from the Russian hacking of the Democratic National Committee ("DNC"). In particular, NSS is informed and believes and thereon alleges that according to one indictment of Russian military officers, "CrowdStrike missed a spot, and one computer infected with the [Russian's] malware 'remained on the DNC network until in or around October 2016.'" *See https://www.thedailybeast.com/russian-hackers-kept-dnc-backdoor-longer-than-anyone-knew.* Specifically, CrowdStrike "took steps to exclude [the Russian] intruders from the [DNC's] networks" but "[d]espite these efforts, a Linux-based version of X-Agent, programmed to communicate with the GRU [Russian successor to KGB]-registered domain linuxkrnl[.]net, remained on the DNC network until in or around October 2016." *Id.*

47.    Rather than acknowledge that it missed the existence of this Russian hacker of EPP Security Defects in its products, "CrowdStrike referred the [press's] inquiry to the DNC." *Id.* NSS Labs is informed and believes and thereon alleges that this refusal to acknowledge responsibility is

consistent with CrowdStrike's attempts to conceal EPP Security Defects in its products by preventing testing of its EPP and AEP products unless it can control the testing by, for example, insisting on adherence to the AMTSO Testing Standard.

48.    Defendant CrowdStrike is and at all relevant times herein has been a member of AMTSO and at various times here relevant one or more of its employees has served on the Executive Committee and/or the Board of Directors of AMTSO.

**SYMANTEC**

49.    Symantec began in business in 1982 and entered the cybersecurity market in 1989 with the introduction of Symantec Antivirus for the Macintosh.  In August 1990 it purchased Peter Norton Computing, and in 1991 introduced Norton Antivirus for personal computers operating the Microsoft operating system.  Since that time all Symantec Antivirus products have been marketed under the Norton Antivirus name.  Symantec offers a variety of EPP platforms, including an AEP product called Symantec Endpoint Protection and Advanced Threat Protection Platform.

50.    Mark Kennedy, who has worked for Symantec since 1991 and is currently a Symantec "Distinguished Engineer," is and has been since 2009 a member of the AMTSO Board of Directors.

**ESET**

51.    ESET offers an AEP product called ESET Endpoint Security.

52.    Righard J. Zwienenberg, a "Senior Research Fellow" of ESET since 2012, served as a member of the AMTSO Board of Directors from 2016 until he resigned around the time that Tony Anscombe, the "Global Security Evangelist and Industry Ambassador" for ESET, delivered a presentation criticizing NSS Labs' testing services and methodology  and the position of its CEO on the draft testing standard in an AMTSO meeting in Portland, Oregon.  This May 21, 2018, meeting was the one at which AMTSO decided to put adoption of the AMTSO Testing Standard to a vote of the members of AMTSO.

53.    ESET was a founding member and active participant in the EPP Vendor Conspiracy. It advocated for the adoption by AMTSO of testing standards that would put substantial restrictions on testing services and give EPP Vendors advance notice of all tests that would be run against the product.

54.     NSS Labs is informed and believes and thereon alleges that ESET believed that the AMTSO Testing Standard as proposed to AMTSO members for approval was not sufficiently restrictive of testing services and did not accomplish all of the goals of the EPP Vendor Conspirators.

55.     NSS Labs is informed and believes and thereon alleges that ESET, knowing that because of the dominance, and dominant number, of EPP vendors among the AMTSO membership the AMTSO Testing Standard would be adopted regardless of how ESET voted on adoption, voted against adoption of the AMTSO as a signal to other EPP vendor-members of AMTSO that a more restrictive standard should be adopted or that the AMTSO Testing Standard should be amended after adoption to make it more restrictive of how EPP testing services performed tests.

56.     ESET is not an innocent beneficiary of the AMTSO Testing Standard but an active participant in a conspiracy among EPP Vendors to develop a testing standard and then to boycott testing services that do not adhere to that standard.  That ESET may have preferred a more restrictive standard and thus voted against adoption of the AMTSO Testing Standard because it did not go far enough is not relevant to its liability as a member of the EPP Vendor Conspiracy.

**AMTSO**

57.     According to AMTSO's website, AMTSO "was founded in 2008 to improve the business conditions related to the development, use, testing and rating of anti-malware products and solutions."

58.     NSS Labs is informed and believes and thereon alleges that most EPP Vendors, including most AEP Vendors, are and at all relevant times herein have been members of AMTSO.

59.     AMTSO operates for the benefit of its EPP Vendor members, among other things protecting them from competition by nonmembers of AMTSO.  A very recent (September 11, 2019) example of the use of AMTSO to protect EPP Vendor members of AMTSO from competition from nonmembers is an email sent by the Chairman of the Board of AMTSO, copied to all AMTSO members about access to AMTSO's RTTL.  According to AMTSO, "The Real-Time Threat List (RTTL) is a repository of malware samples collected by experts from around the world. The repository is managed, maintained and secured by the Anti-Malware Testing Standards Organization (AMTSO)."  https://www.amtso.org/rttl/."

60.     Simon Edwards, the Chairman of the Board of AMTSO and a Director of AMTSO member SE Labs, sent an email to Brad Albrecht, the CTO OF AMTSO, see https://www.amtso.org/about-amtso/, copied to the AMTSO membership, stating:

> Hi vendor members,
>
> I think it would be a real shame to see the end of the RTTL. One real-world use of it is as a gatekeeper for shady vendors looking to enter Virus Total and suck all of your IP into their own products, before marketing themselves as superior alternatives to your own companies/ products!
>
> Please contact Brad at the soonest opportunity and at least commit to involvement, even if you can't integrate immediately. We've fought so hard to get where we are. Inaction leading to the death of the RTTL would really make me question what we're doing at AMTSO and would remove so much value, both perceived and real.

In this email, the Chairman of the Board of AMTSO solicits concerted action by AMTSO "vendor members" to prevent "shady vendors" [from] "looking to enter Virus Total[2]" to compete with the AMTSO "vendor members."  A true and correct copy of Mr. Edwards' September 11, 2019 email, and an immediately succeeding email attempting to "[s]crub that call to action" is attached hereto as **Exhibit F**.[3]

61.     Unlike other organizations that promulgate testing standards, like the famous Underwriters Laboratories where testing and other standard development is open not just to companies who sell (or test) products but to "[a]ll persons directly affected by a [proposed standard]," AMTSO's membership consists principally of cybersecurity companies and only a small number of

---

[2] "Virus Total is a website created by the Spanish security company Hispasec Sistemas. Launched in June 2004, it was acquired by Google Inc. in September 2012. The company's ownership switched in January 2018 to Chronicle, a subsidiary of Alphabet Inc.

VirusTotal aggregates many antivirus products and online scan engines to check for viruses that the user's own antivirus may have missed, or to verify against any false positives. Files up to 550 MB can be uploaded to the website, or sent via email (max. 32MB). Anti-virus software vendors can receive copies of files that were flagged by other scans but passed by their own engine, to help improve their software and, by extension, VirusTotal's own capability. Users can also scan suspect URLs and search through the VirusTotal dataset. VirusTotal for dynamic analysis of malware uses Cuckoo sandbox. VirusTotal was selected by *PC World* as one of the best 100 products of 2007."  https://en.wikipedia.org/wiki/VirusTotal

[3] For reader convenience, exhibits added to this First Amended Complaint were given exhibit letters following the letters assigned to exhibits attached to the original complaint.

companies who provide testing services to the cybersecurity companies. Compare
https://ulstandards.ul.com/about/developing-standards/ with https://www.amtso.org/members/.

62.    AMTSO and its Board of Directors largely comprise, and are controlled by, EPP
product vendors.

63.    CrowdStrike has had and currently does have a leadership position on both AMTSO's
Board of Directors and its "Executive Team."  In particular, Brad Albrecht, CrowdStrike's Senior
Director of Technology, is the "Chief Technology Officer" of AMTSO and a member of the AMTSO
"Executive Team" which "drives the day-to-day operation of the organization."
https://www.amtso.org/the-amtso-team/.

64.    Mr. Albrecht was also elected to a three-year term as a  director of AMTSO at its most
recent election for Board of Directors, which took place from June 5 to June 16, 2018. Mr. Albrecht's
three-year term as a member of the AMTSO Board of Directors began on July 1, 2018.

65.    Symantec currently has, and has had at least since 2009 when Mark Kennedy joined
the Board, a representative on the AMTSO Board of Directors.

66.    ESET had a representative on the AMTSO Board of Directors from June 2016 until
the May 21, 2018 AMTSO Portland meeting.  ESET was thus aware that the AMTSO Testing
Standard was heavily weighted in favor of EPP Vendors who favored adoption of the standard as
opposed to testing services who did not.  This allowed ESET, which  favored a more restrictive testing
standard,  to vote against adoption of the AMTSO Testing Standard as a signal to other EPP Vendors
that a more restrictive testing standard should be adopted, while being assured it nevertheless would
be adopted.

67.    While providers of EPP testing services, including NSS Labs, are allowed to and do
participate in AMTSO, they constitute a small minority of AMTSO members and are easily outvoted
by EPP product vendor members as indeed they were in the adoption of the AMTSO Testing
Standard.

68.    NSS Labs is informed and believes and thereon alleges that since its founding,
AMTSO has directed virtually all its actions at attempting to restrain competition in the testing of
EPP products in general and in the "testing and rating of anti-malware products and solutions" in

particular, by prescribing rules for the testing of EPP products that are designed to allow EPP product vendors to conceal the EPP Security Defects of their products from actual and potential customers.

69.     NSS Labs is informed and believes and thereon alleges that at least as early as 2009, AMTSO and its members began drafting "standards" for "testing and rating of anti-malware products and solutions" that were intended to be imposed on providers of testing services for EPP products, including AEP products.  NSS Labs is informed and believes and thereon alleges that under these draft standards, members of AMTSO were going to be required to deal only with providers of EPP testing services who complied with AMTSO's standards for testing and rating of anti-malware products and solutions and were to be prohibited from dealing with EPP testing services that did not comply with AMTSO's standards.  NSS Labs is informed and believes and thereon alleges that AMTSO abandoned these original proposed standards due to antitrust concerns but later reinitiated efforts to implement standards that eventually became the current AMTSO Testing Standard.

70.     For example, in August 2016, AMTSO engaged in an internal email discussion among its members in which CrowdStrike, through Dimitri Alperovitch and Don Larson, and Symantec, through at least Mark Kennedy, participated, concerning the terms on which access to VirusTotal.com, the leading platform for sharing malware (so it can be detected and blocked), should be available to EPP vendors.  The AMTSO EPP vendor members and AMTSO itself agreed, among other things, that access should only be available to EPP vendors who are AMTSO members and whose products are only tested by EPP testing services  who are also AMTSO members.  In addition, both the EPP vendors and the EPP Testing services would be required to have agreed to adhere to AMTSO's "Fundamental Principles of Testing" available at https://www.amtso.org/wp-content/uploads/2018/05/AMTSO-Fundamental-Principles-of-Testing-FINAL.pdf, and to the AMTSO Testing Standard once adopted.  This discussion was designed to bolster the Conspirators' efforts to restrain trade in the Relevant Markets (as defined below) by restricting access to VirtusTotal.com, access to which is essential effectively to compete in the Relevant Markets.

**THE CONSPIRACY**

71.     NSS Labs is informed and believes and thereon alleges that at least as early as a late 2016 meeting of the AMTSO "Standards Working Group" in Krakow, Poland, the EPP Vendor

1    Conspirators met with the express intent, purpose and effect of obtaining agreement among

2    competitors to refuse to do business with companies, including specifically NSS Labs, who attempt

3    to perform public tests of their products using testing methodologies other than those agreed to by

4    the EPP Vendor Conspirators and embodied in the AMTSO Testing Standard.

5           72.    NSS Labs is informed and believes and thereon alleges that at the RSA Security

6    Conference held in San Francisco California on February 13-17, 2017, CrowdStrike, through its

7    Chief Technology Officer, Dimitri Alperovitch, organized a meeting of the EPP Vendor Conspirators

8    with the express intent, purpose and effect of obtaining agreement among the competitors to refuse

9    to do business with companies, including specifically NSS Labs, who attempt to perform public tests

10   of their products using testing methodologies other than those agreed to by the EPP Vendor

11   Conspirators and embodied in the AMTSO Testing Standard.

12          73.    The EPP Vendor Conspirators agreed with defendant AMTSO that AMTSO would

13   adopt "standards" for "testing and rating of anti-malware products and solutions," that adherence to

14   such standards would be mandatory at least among the EPP Vendor Conspirators, and that the EPP

15   Vendor Conspirators would refuse to deal with any cybersecurity testing service that did not adhere

16   to the testing "standards" to be adopted by AMTSO.

17          74.    In the months preceding the vote on adoption of the AMTSO Testing Standard,

18   AMTSO announced on or about October 19, 2017, that "[t]o ensure this documentation [relating to

19   the proposed AMTSO Testing Standard] remains reasonably private to the AMTSO community, we

20   are implementing access restrictions on some areas of the AMTSO website."  Thus AMTSO took

21   specific actions to prevent non-AMTSO members, including actual and potential customers for EPP

22   products, from learning about the proposed AMTSO Testing Standard.

23          75.    Shortly thereafter, a debate arose among the AMSTO members about whether the

24   votes in favor or opposed to its adoption should be public.  Several EPP testing services companies

25   expressed the view that the votes should be confidential (secret).  AMTSO itself (through its president

26   and CEO, Denis Batchelder) strongly favored a public vote.  While AMTSO board member Mark

27   Kennedy of Symantec was adamant in his communications with the AMTSO membership that the

28   vote should be public, the AMTSO representative of one EPP vendor member expressed why the

vote should be secret: "Hearing all the opinions, I think secret ballot is better.  With open ballot, there are chances of using information on someone's positions outside of the intended purpose of developing a standard.  Debates on the issues are being done in open already where anyone can voice their opinions.  Secret ballot also will [sic] anyone from just 'following the crowd' of the fear of intimation of voting against a majority which may be known in open ballot."  Notwithstanding the request by the EPP testing services AMTSO members that the vote be secret for reasons including those expressed above by the EPP vendor member of AMTSO, the vote was in fact public.

76.    On or about December 4, 2017, one of the EPP testing services company members of AMTSO [not NSS Labs] sent an email to the AMTSO membership stating that some EPP vendor members had threatened it with litigation if it tested their products over their objections.  In the email the testing service company member of AMTSO wrote:  "But the main victims [of EPP vendors seeking to prohibit testing] are the customers in a case like this. Testing is hard and complex. We don't know how to do a perfect test. We do believe customers should test the product themselves the same as they rely on professional testers. But whenever vendors provide the inexperienced customer a flawed methodology to test with and meanwhile professional testers are prohibited from independently testing a product, there will be no winners on the long run.  Our questions are the following:  (1) Is it ethical behavior to reply to a 'test notification' with legal threats, without trying to discuss a solution first? This question applies to both independent and sponsored tests. (2) Should AMTSO allow vendors who are members to threaten labs who are members with legal action to prevent them testing their products? For example threatening them BEFORE they test their products - so they can have no evidence that the lab has or would do anything biased, they just prevent their technology being assessed by any lab they choose. So by definition, they choose who can and who can't test their technology. So a third party (customer) can only have the efficacy of a vendors technology assessed by an AMTSO lab that the vendor chooses."

77.    In response to the EPP testing services company member of AMTSO's email, Ms. Jaimee King, the general counsel of AMTSO, responded, copying all AMTSO members, "You are prohibited from discussing the 'status or substance of any ongoing or threatened litigation.'"

78.     When the EPP testing services company member of AMTSO replied that it was a generic question that did not involve ongoing or threatened litigation, AMTSO board member Mark Kennedy of Symantec responded:  The wording is "ongoing or **threatened** litigation" (emphasis added).

79.     NSS Labs is informed and believes and thereon alleges that the response of AMTSO though its general counsel, and particularly the follow-on response of AMTSO board member Mark Kennedy of Symantec, to the email by the EPP testing services company member of AMTSO in which the entire AMTSO membership was copied was to further the conspiracy among the EPP Vendor Conspirators in an attempt to intimidate EPP testing services companies who would not agree to follow the AMTSO Testing Standard once adopted.

**THE AMTSO TESTING STANDARD**

80.     According to the AMTSO website, in May 2018 AMTSO adopted the AMTSO Testing Standard (*see* **Exhibit A**) which it describes as a "standard" for "testing or rating of anti-malware products and solutions" which "specifies the information to communicate and how that information should be communicated between testers and vendors with products or solutions that may be included in public and private tests."  Moreover, it is the "mission" of AMTSO to establish specific rules for "testing behavior within the industry," a mission it fulfilled with the adoption of the AMTSO Testing Standard.

81.     The purpose of the AMTSO Testing Standard is plain on its face—it is aimed at providing the EPP Vendor Conspirators the opportunity to know in advance exactly where, when and how their EPP products will be tested such that the EPP Vendor Conspirators can tailor their products in advance to the threats against which their products will be tested and score better on any public or private test.  But knowing how one's product will be tested in advance defeats the entire purpose of independent third-party testing, no less than a student knowing the questions and answers before a test defeats the entire purpose of a school test.  Indeed, obtaining such knowledge is usually called "cheating."

82.     The goal of the AMTSO Testing Standard is manifest throughout its provisions.  For example, Section 4.1 of AMTSO Testing Standard provides:  "Tester shall provide notification of a

Test Plan to all potential Test Subject Vendors" and that the "Test Plan notification shall be made no more than two (2) calendar months, and no less than five (5) Business Days, before the Commencement Date of a Test. This gives EPP Vendor Conspirators who do not want their products tested the ability to block testing before it has begun.

83.     Section 6.1.1 requires a tester to state in the Test Plan a "stated intent . . . to follow th[e] AMTSO Standard." Section 6.1.2 requires that the Test Plan reveal the "types of Products that are intended to be included in the Test." Section 6.1.3 requires the Test Plan to reveal: "The purpose of the Test, including the type(s) of threats the Test Subjects will be tested against." Section 6.1.4 requires that the Test Plan reveal the "Commencement Date of the Test, or a range of dates during which the Test may commence." Section 6.1.6 requires the Test Plan to reveal: "A clear definition of the methodology of the Test, which shall include a description of the testing environment and what the Test is intending to achieve." Section 6.1.7 requires the Test Plan to reveal: "A statement of intention of Product versions, configurations to be applied, and which functionality of the Products will be tested." Section 6.1.8 requires the Test Plan to reveal: "An overview of the Test's scoring and certification plan." Section 6.1.9 requires the Test Plan to reveal: "Instructions on how the Test's results can be disputed." Section 6.1.11 requires the Test Plan to reveal: "A reasonable amount of information on sample provenance and sample Collection strategy." Section 6.1.12 requires the Test Plan to reveal: "A clear description of how samples will be Curated, and how and when feedback will be solicited and processed and what evidence will be provided." Section 6.4 requires tester to "notify all Test Subject Vendors of any significant changes to previously communicated Test Plans.".

84.     These provisions give the EPP Vendor Conspirators the ability to tailor their products in advance to the threats against which their products will be tested. These provisions also defeat the purpose of independent third-party testing by giving the EPP Vendor Conspirators the ability to cheat the tests they will be subject to and to give consumers the false impression that EPP products are free from EPP Security Defects when in fact they are not. Misleading the consumer and the public regarding the effectiveness of cybersecurity products has a direct effect on public safety and the safety of businesses and individuals who rely on EPP products. These provisions also give the EPP Vendor Conspirators the opportunity to discredit tests that do not provide ahead of time full

disclosure of when, where and how the tests will be conducted and allows the EPP Vendor Conspirators to credit only those tests that they deem appropriate.  These provisions also give the EPP Conspirator Vendors the opportunity to discriminate between those testers and tests that provide them with the most favorable results.  These provisions also arm the EPP Vendor Conspirators with a mechanism to intimidate and shun those testers who do not disclose the exact tests they intend to perform prior to running a test.

85.    These provisions serve no purpose other than giving EPP Vendor Conspirators the ability to tailor their products in advance to the threats against which their products will be tested, obviating the entire purpose of objective testing.

86.    Section 9.2.5 further requires EPP testing services to "provide AMTSO with appropriate data to run the compliance confirmation process that is not otherwise included in the publicly released final Test results, including the Test Plan, Test results, and commentary."  This effectively requires EPP testing services to hand over their intellectual property to AMTSO.  It also allows AMTSO to keep the EPP Vendor Conspirators informed about which cybersecurity testing companies are in fact adhering to the AMTSO Testing Standard so that adherence to the goals of the conspiracy could be verified.

87.    The AMTSO Testing Standard also allows AMTSO to exclude competition in testing standards because testing services cannot adhere to an alternative standard that is inconsistent with the AMTSO Testing Standard without being boycotted by the EPP Vendor Conspirators, thus precluding the promulgation of alternative standards.

88.    Adoption of at least the foregoing provisions of the AMTSO Testing Standard allows the EPP Vendor Conspirators to rig in advance the outcome of tests performed by testing services who adhere to the AMTSO Testing Standard because EPP Vendor Conspirators know in advance how their products will be tested.  The outcome of the tests therefore will misrepresent to the public the effectiveness of their EPP products and conceal the products' vulnerability to EPP Security Defects.

89.    AMTSO's  own Fundamental Principles of Testing, Principle 2, states that "[t]esting must  be  unbiased,"  https://www.amtso.org/wp-content/uploads/2018/05/AMTSO-Fundamental-

Principles-of-Testing-FINAL.pdf, but the AMTSO Testing Standard biases tests (a) in favor of low quality status quo products and (b) against innovators who cannot demonstrate the superiority of their products, because the AMTSO Testing Standard prevents new and potential entrants from demonstrating through objective testing their superior zero-day exploit defense and other advantages compared to incumbents.

90.     Section 1.2 of the AMTSO Testing Standard states that "AMTSO recognizes the need for independent product testing to help end users adequately understand the differences in security products, and to validate Vendors' claims in the market," but the AMTSO Testing Standard intentionally undermines its own stated goal.

91.     The EPP Vendor Conspirators' actions in boycotting testing services that do not adhere to the AMTSO Testing Standard is no different in anticompetitive effect than if automobile manufacturers agreed among themselves that they would not allow their cars to be tested  by Consumer Reports, Motor Trend and the like unless they were provided the testing methodology in advance.

92.     While an EPP Vendor could unilaterally decide (subject to compliance with other laws) not to allow its products to be tested by testing services that do not adhere to the AMTSO Testing Standard, it would face the same  risk of consumer rejection and loss of sales  and profits that an individual car manufacturer would face if it unilaterally decided to restrict the testing of its products by Consumer Reports, Motor Trend and the like but its competitors did not.  The EPP Vendor Conspirators avoided the risk of lost  sales and profits to competitors who permitted testing by testing  services that do not adhere to the AMTO Testing Standard.

93.     NSS Labs objected to the AMTSO Testing Standard prior to its adoption and raised concerns about the conflicts of interest of those driving the adoption of the AMTSO Testing Standard and the barriers the AMTSO Testing Standard erects to independent third-party testing of EPP products.

94.     NSS Labs is informed and believes and thereon alleges that other testers of EPP products raised similar concerns.

**THE AMTSO TESTING STANDARD WAS INTENDED TO AND DOES RESTRAIN COMPETITION AMONG EPP VENDORS, TESTING SERVICES AND TESTING STANDARD PROMOTERS**

95.     One of the anti-competitive effects of the AMTSO Testing Standard is that by requiring the EPP Vendor Conspirators to be given advance knowledge of the threats or "exploits" against which their products will be tested, it is impossible for their products to be tested against "zero-day exploits."  According to defendant Symantec:

> A zero-day exploit is an undisclosed application vulnerability that could be exploited to negatively affect the hardware, applications, data or network. The term **"zero day"** refers to the fact that the developers have "zero days" to fix a problem that has just been exposed and may have been already exploited. Hackers seize on that security vulnerability to launch a cyber attack on the same day a weakness is discovered. Basically, the vulnerability is exploited before a fix becomes available.

> Zero-day exploits can take the form of viruses, polymorphic worms, Trojans, and various types of malware. All of these can be bought, sold, and traded. Hacker groups often post zero-day exploits as organizations under attack scramble to release patches against the security holes."

https://www.symantec.com/connect/blogs/guide-zero-day-exploits (emphasis in original).

96.     If a cybersecurity company must be given advance notice of the threats against which its  product will be tested, its cybersecurity product cannot be tested against zero-day exploits because by definition zero-day exploits are unknown to a cybersecurity company before the attack or "exploit."

97.     As a result of the AMTSO Testing Standard, cybersecurity companies do not need to compete with each other on their ability to defend against zero-day exploits because their performance against them cannot be compared.

98.     The AMTSO Testing Standard also deters new and potential  entrants from competing on the basis of superior defense against zero-day exploits because the AMTSO Testing Standard prevents new and potential entrants from demonstrating through objective testing their superior zero-day exploit defense compared to incumbents.

99.      The EPP Vendor Conspirators exploited the opportunities for anticompetitive activity by conspiring with each other and with AMTSO to adopt and use the AMSTO Testing Standard  to boycott testing services and their tests that would expose  flaws in their products.  By doing so, the

AMTSO Testing Standard allows EPP Vendors to maintain their collective dominance in the market for EPP products and AEP products.

**THE AMTSO TESTING STANDARD WAS AND IS INTENTED TO BE MANDATORY**

100.   Although AMTSO promoted the AMTSO Testing Standard as a "voluntary standard," in fact it was intended by both AMTSO and its co-conspirators to be mandatory on both EPP Vendors and AEP Vendors, and on EPP testing companies and AEP testing companies, from the first discussions of the possibility of AMTSO adopting a testing standard.

101.   The adoption of a (mandatory) standard was held to be illegal *per se* in *National Macaroni Mfrs. Ass'n. v. FTC*, 345 F.2d 421 (7th Cir. 1965), because the mandatory product standard allowed manufacturers to brand products as "macaroni" that included an inferior type of wheat in response to a price increase for high quality wheat. "'Commission concluded that 'where all or the dominant firms in a market combine to fix the composition of their product with the design and result of depressing the price of an essential raw material, they violate the rule against price-fixing agreements as it has been laid down by the Supreme Court.'' We agree." *Id.* at 426.

102.   The AMTSO Testing Standard enforced by the EPP Vendors' boycott of testing services that do not adhere to it allows the EPP Vendor Conspirators to lower quality or at least restrain competition on quality, including especially the ability to protect against "zero-day exploits," which deters new entrants and allows the EPP Vendor Conspirators to increase or maintain the quality-adjusted prices of their products, which is not significantly different from a direct agreement to increase or maintain prices. AMTSO is the hub in this hub-and-spoke conspiracy and is thus liable as a co-conspirator.

103.   Consistent with, and in furtherance of, the conspiracy amongst the EPP Vendor Conspirators, and their and AMTSO's intent that the AMTSO Testing Standard would be mandatory, on May 19, 2018, just before the May 21, 2018 Portland Oregon AMTSO meeting, Mark Kennedy of Symantec sent an email to the AMTSO membership in which he stated, among other things: "Moreover, Symantec is committed to using the standards for all privately commissioned tests going forward. That means if you want the money Symantec will pay for those tests, you will have to follow the standards. If a tester doesn't like that, too bad. We will find one of their competitors who

will.  If an included vendor doesn't like that, put your reasons into the commentary and let the reader weigh your arguments.  We intend to put our money where our vote is.  I encourage all of Symantec's competitors to do the same."  A true and correct copy of the May 19, 2018 email is attached hereto as **Exhibit D**.

104.   NSS Labs is informed and believes and thereon alleges that in response to Mr. Kennedy's email and/or for other reasons, some or all of the other EPP Vendor Conspirators announced in an AMTSO meeting in Portland, Oregon on May 21, 2018 their agreement that they will not do business with cybersecurity testing organizations that do not adhere to the AMTSO Testing Standard.

105.   Consistent with, and in furtherance of, the conspiracy among the EPP Vendor Conspirators that the purportedly "voluntary" AMTSO Testing Standard would be in fact mandatory, in June 2018, an agenda for an AMTSO meeting concerning the adoption of the AMTSO Testing Standard had as one of only four agenda items: "Driving Adoption: Companies Requiring AMTSO Standards."  NSS Labs is informed and believes and thereon alleges that the meeting agenda confirms that Defendants intend that the EPP Vendor Conspirators will refuse to deal with cybersecurity testing companies that do not adhere to the AMTSO Testing Standard.

106.   In furtherance of the conspiracy and in recognition that Defendants intend the AMTSO Testing Standard be mandatory,  on or about September 5, 2018, Dennis Batchelder, the President of AMTSO, posted on the AMTSO website a blog which states in part:  "We expect to see the first tests reaching full compliance with the AMTSO Standard in the next few weeks, *and will continue to strongly encourage all testing organizations, and other parties engaging in anti-malware testing, to follow the AMTSO Standard wherever possible*.  (Emphasis added.)  NSS is informed and believes and thereon alleges that this statement was intended to be understood and was understood by AMTSO members, and particularly by testing service AMTSO members, that the purportedly voluntary AMTSO Testing Standard was in fact mandatory and that  testing services that did not adhere to it were at risk of being boycotted by EPP Vendor members of AMTSO.  A true and correct copy of the September 5, 2018 AMTSO blog post is attached hereto as **Exhibit E**.

107.    Less than two weeks later, on September 15, 2018, Dennis Batchelder admitted that there were competitive issues in adopting the AMTSO Testing Standard in an email to Mark Kennedy, AMTSO board member from Symantec, discussing potential conflicts around adopting a different proposed standard:  "We created a standard that applies to testers and vendors [the AMTSO Testing Standard].... that's pretty conflicted, too."

108.    NSS is informed and believes and thereon alleges that  at least some of the Defendants have temporarily scaled-back their efforts to make the AMTSO Testing Standard mandatory on EPP Vendors, AEP Vendors, EPP testing companies and AEP testing companies because of the scrutiny to which the AMTSO Testing Standard was exposed by the filing of the original complaint in this action on September 18, 2018.

109.    NSS is informed and believes and thereon alleges that at least some of the  Defendants have continued the temporary suspension of their efforts to make the AMTSO Testing Standard mandatory on EPP Vendors, AEP Vendors, EPP testing companies and AEP testing companies because the Antitrust Division of the United States Department of Justice ("DOJ Antitrust Division") is investigating the AMTSO Testing Standing ("DOJ Investigation"), apparently as a result of the filing of original complaint in this Action.  In particular, it became  public at least by April 23, 2019 that:

> Cybersecurity vendors including CrowdStrike, Symantec and ESET are under the microscope at the Justice Department for their role in potentially excluding third-party testing services that don't adhere to particular standards, MLex has learned.
>
> The civil investigation is in the initial stage, with the Justice Department having sent letters to at least those three companies, along with the Anti-malware Testing Standards Organization, or AMTSO, and NSS Labs, requesting that the companies retain relevant documents, it is understood.
>
> The investigation is understood to have been opened in late February. Antitrust prosecutors in San Francisco are investigating the conduct, it is understood.
>
> The investigation follows a private lawsuit filed by security testing service NSS that accused AMTSO and the three companies of creating biased testing protocols and boycotting testing services that refuse to adhere to the standards.

https://mlexmarketinsight.com/insights-center/editors-picks/antitrust/north-america/cybersecurity-testing-standards-under-antitrust-scrutiny-at-justice-department.

110.    NSS Labs is informed and believes and thereon alleges that should this Court not find the AMTSO Testing Standard, at least as enforced by the EPP Vendor Conspirators' group boycott, unlawful, Defendants will enforce adherence to it through their group boycott.

**THERE ARE NO PLAUSIBLE PRO-COMPETITIVE JUSTIFICATION FOR A MANDATORY AMTSO TESTING STANDARD**

111.    Notwithstanding AMTSO and the EPP Vendor Conspirators' contention that there are "plausible pro-competitive justification for the AMTO Testing Standard," there is no pro-competitive justification, and Defendants advance none, for a mandatory (*de facto*  or  otherwise) AMTSO Testing Standard enforced by the EPP Vendor Conspirators' boycott of testing services which do not adhere to it, even if the enforcement of the mandatory nature of the  standard is temporarily suspended as a result of the filing of the original complaint in this matter and the DOJ Investigation.

112.    By making the AMTSO Testing Standard mandatory (*de facto*  or  otherwise) on testing services, AMTSO also has effectively eliminated competition by promulgators of alternative testing standards since testing services cannot adhere to a competing incompatible testing standard if they are subject to boycott by the EPP Vendor Conspirators if they do not comply with the AMTSO Testing Standard.

113.    But even if adherence to the AMTSO Testing Standard were not enforced, the AMTSO Testing Standard, which is intended to and does lead to a reduction in competition on quality and a corresponding increase or at least maintenance of quality-adjusted prices, is illegal  per se and unreasonably restrains trade.

**AMTSO  IS THE HUB IN A "HUB AND SPOKE CONSPIRACY"**

114.    AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS, is liable as the "hub" in a "hub and spoke conspiracy." *See, e.g., United States v. General Motors Corp.*, 384 U.S. 127 (General Motors and auto dealer associations liable for *per se* violation of Section 1 of the Sherman Act because, although neither the dealer associations nor General Motors was in a vertical relationship with GM's Los Angeles area dealers, "[t]he dealers collaborated, through the associations and otherwise, among themselves and with General Motors, both to enlist the aid of General Motors and to enforce dealers' promises to forsake the discounters.")  *Id.* at 143.

115. "Similarly, in *Toys "R" Us, Inc. v. Fed. Trade Comm'n,* 221 F.3d 928 (7th Cir.2000), the Seventh Circuit upheld the Federal Trade Commission's holding that Toys "R" Us had coordinated a horizontal conspiracy [among toy  makers] in restraint of trade  through signing identical vertical agreements with a number of toy manufacturers. In these agreements, each manufacturer agreed to restrict the distribution of its products to low-priced warehouse club stores on the condition that the other manufacturers would do the same. *Id.* at 930." *In re Electronic Books Antitrust Litigation*, 859 F.Supp.2d 671, 685 (S.D.N.Y. 2012) ("*e-Books* ").

116. *e-Books* denied a motion to dismiss where it was alleged that "Apple served as a 'hub' in a 'hub-and-spoke' conspiracy," 859 F.Supp.2d at 686, among five of the six major book publishers to raise the price of e-books.  This conspiracy was effected by Apple entering into individual contracts with the publishers, *id* at 683.  Apple was subject to liability as a co-conspirator even though it did not compete with the publishers, much as GM did not compete with its dealers and Toys "R" Us did not compete with toy manufacturers.

117. Leading up to and following adoption of the AMTSO Testing Standard, the EPP Vendor Conspirators refused to deal with testing services, like NSS, that do not adhere to the AMTSO Testing Standard, at a minimum engaging in parallel conduct "placed in a context that raises a suggestion of preceding agreement," including with AMTSO. *See e-books*, 859 F.Supp.2dat 683 *quoting Bell Atlantic Corp. v Twombly,* 550 U.S. 544, 557 (2007).  This is in part because each EPP Vendors' refusal to deal with testing laboratories that did not comply with the AMTSO Testing Standard "would have contravened that defendant's self-interest in the absence of similar behavior by its rivals." *e-books*, 859 F.Supp.2d at 683 (citation omitted).

118. NSS Labs is informed and believes and thereon alleges that since entering into the conspiracy alleged herein, none of the Defendants ever (a) undertook affirmative steps inconsistent with the object of the conspiracy to disavow or defeat the goal or purposes of the conspiracy; (b) acted in a manner reasonably calculated to notify its coconspirators that it was no longer participating in the conspiracy; or (c) disclosed the conspiracy to law enforcement authorities.  Accordingly, NSS Labs is informed and believes and thereon alleges that each of the Defendants remains fully liable as a co-conspirator whether or not at some point it ceased active participation in the conspiracy.

## AMTSO IS NOT INSULATED FROM PER SE LIABILITY BY SDOAA

119.    The Supreme Court stated in that *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp*, 456 U.S. 556 (1982), that "a standard-setting organization … can be rife with opportunities for anticompetitive activity."  *Id.* at 571.

120.    Notwithstanding its "rife opportunities for anticompetitive behavior," AMTSO claims it is protected as a matter of law from *per se* liability by the Standards Development Organization Advancement Act of 2004,  ("SDOAA"), 15 U.S.C. §§ 4301-4306.  But the SDOAA does not protect AMTSO, at least as a matter of law, from per se liability for at least the reasons alleged herein and the reasons set forth in the "Statement of Interest of the United States" filed by the Antitrust Division of the United States Department of Justice in this case, Dkt. 91.

121.    First, the burden of proof to establish the applicability of the SDOAA should be on AMTSO, Dkt. 91 at 6, and "it is incorrect to grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense.  *McCready v. eBay, Inc*., 453 F.3d  882, 892 n.2 (7th Cir 2006)." Dkt. 91 at 6.

122.    Second, "NSS alleges facts that raise serious doubt that AMSTO [*sic*] qualifies as an SDO.   NSS pleads with specificity that cybersecurity vendors, who compete with each other, are able to use  AMTSO  to restrict competition despite objection among  testing companies.  This is because,  according to NSS, AMTSO's makeup is unbalanced toward vendors.  Taken as  true, a fact-finder could conclude that AMTSO does  not use procedures that ensure a balance of interests, and that  AMTSO thus fails to qualify for  the *per se* exemption under the SDOAA." Dkt. 91 at 7.

123.    Here the EPP Vendors and the AEP Vendors  exploited the opportunities for anticompetitive activity by conspiring with each other and with AMTSO to adopt and use the AMSTO Testing Standard  to boycott testing services and their tests that would expose  flaws in their products.   By doing so, the AMTSO Testing Standard allows EPP Vendors to maintain their collective dominance in the market for EPP products and AEP products and to raise or maintain the quality-adjusted prices for those products.

**RELEVANT MARKETS**

124.   NSS Labs is informed and believes and thereon alleges that the acts as herein alleged affect commerce in six relevant markets.

125.   NSS Labs is informed and believes and thereon alleges that the first relevant market affected by the acts herein alleged is the national market for EPP products (the "EPP Product Market").

126.   NSS Labs is informed and believes and thereon alleges that the second relevant market affected by the acts herein alleged is the national market for AEP products (the "AEP Product Market").

127.   NSS Labs is informed and believes and thereon alleges that the third relevant market affected by the acts herein alleged is the national market for EPP product testing services (the "EPP Testing Market").

128.   NSS Labs is informed and believes and thereon alleges that the fourth relevant market affected by the acts herein alleged is the national market for AEP product testing services (the "AEP Testing Market").

129.   NSS Labs is informed and believes and thereon alleges that the fifth relevant market affected by the acts herein alleged is the national market for testing standards for EPP products (the "EPP Testing Standard Market").   NSS Labs is informed and believes, and thereon alleges, that AMTSO is the sole participant in the EPP Testing Standard Market and the AMTSO Testing Standard is intended to maintain that monopoly position.

130.   NSS Labs is informed and believes and thereon alleges that the sixth relevant market affected by the acts herein alleged is the national market for testing standards for AEP products (the "AEP Testing Standard Market").   NSS Labs is informed and believes, and thereon alleges, that AMTSO is the sole participant in the AEP Testing Standard Market and the AMTSO Testing Standard is intended to maintain that monopoly position.

131.   The EPP Product Market, the AEP Product Market, the EPP Testing Market, the AEP Testing Market, EPP Testing Standard Market and the AEP Testing Standard Market will be referred to collectively as the "Relevant Markets."

**EFFECT ON INTERSTATE COMMERCE**

132.    The acts herein alleged have an effect on interstate commerce, in particular in the EPP Product Market and the AEP Product Market by (a) restricting information regarding and therefore the quality of EPP products and AEP products; (b) discouraging entry, and therefore keeping prices high, in the EPP Product Market and the AEP Product Market because vulnerabilities in EPP products and AEP products are concealed from consumers, thus discouraging entry of new EPP products and new AEP products because new products cannot compete based on security quality; and (c) keeping quality-adjusted prices artificially high in the EPP Product Market and the AEP Product Market because, by concealing EPP Security Defects from consumers who would demand better performing products at lower prices if the EPP Security Defects were known to them, EPP Vendors and  AEP Vendors do not have to compete on quality.

133.    The acts herein alleged also have an effect on interstate commerce, in particular in the EPP Testing Market and the AEP Testing Market by preventing competition on quality, and therefore also on price, because all EPP testing companies and AEP testing companies are required to adhere to the AMTSO Testing Standard or else be boycotted by at least the EPP Vendor Conspirators and likely other EPP product members of AMTSO.

**STANDING**

134.    NSS Labs has standing and has suffered antitrust injury as a result of the acts herein alleged because it is the direct and principal target of the concerted refusal to deal/group boycott with EPP Testing companies and AEP Testing companies that do not adhere to the AMTSO Testing Standard.

135.    As the Supreme Court stated:  "If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions." *Blue Shield of Virginia,* 457 U.S. at 484 n. 21 (1982).

136.    The  Ninth Circuit held that independent farmers had standing to sue a rice exporter, even though they were neither competitors nor customers of the rice exporter.  *Amarel v. Connell*, 102 F.3d 1494, 1512 (9th Cir. 1996). The Ninth Circuit relied on *Blue Shield of Virginia* for the rule

that the  direct victims of boycotts have standing even if they are neither competitors nor customers of the boycotters:

> Defendant's alleged boycott also caused direct injury to plaintiffs. The Supreme Court has suggested that, for purposes of standing analysis, the antitrust laws are concerned with the effect on direct victims of boycotts and secondary boycott victims. In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Supreme Court stated in dicta that a plaintiff would have antitrust standing to challenge a concerted refusal to deal where that plaintiff was sufficiently affected by that refusal. It hypothesized that if a group of psychiatrists conspired to boycott a bank until that bank stopped making loans to competing psychologists, antitrust standing would exist not only for the bank, the target of the primary boycott, but also for the psychologists, "against whom the secondary boycott was directed." *Blue Shield of Virginia,* 457 U.S. at 484 n. 21, 102 S.Ct. at 2551 n. 21.

102 F.3d at 1512.

137.     NSS Labs is in the same position relative to defendants as the hypothetical boycotted bank in *Blue Shield of Virginia* who the Supreme Court there and the Ninth Circuit in *Amarel v. Connell* presumed would have standing.  The hypothetical boycotted bank was neither a competitor or a customer of the boycotting psychologists yet it had standing as the direct target of the boycott, just as NSS Labs has standing as the direct victim of defendants' boycott even though it is neither  a competitor or customer of neither the EPP Vendor Conspirators nor AMTSO.

138.     NSS Labs also has standing because it is a member of the "'identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement.'"  *Amarel v. Connell,* 102 F.3d at 1513 (citations omitted).

**ANTITRUST INJURY**

139.     Because one of NSS Labs' key competitive advantages is that its tests are considered objective and reliable because it does not let EPP product vendors  and AEP product vendors know how its tests will be performed or to what malware or what inputs that are not malware their products will be subjected, NSS Labs is being forced to choose between adhering to the AMTSO Testing Standard and losing its competitive advantage and therefore losing revenue and profits, on the one hand, or not adhering to the AMTSO Testing Standard and having its testing services boycotted by the EPP Vendor Conspirators.

140.     The EPP Vendor Conspirators have a dominant share of the relevant markets for EPP products and AEP products,  and thus the inability of testing services to include test results for their EPP and AEP products substantially undermines the value of test reports of such products.

141.     AMTO members include EPP vendors and AEP vendors who account for the vast majority of both sales and installed base in the United States markets for EPP products and AEP products.

142.     Because NSS Labs has chosen to preserve its competitive advantage by not adhering to the AMTSO Testing Standard, Defendants' acts herein alleged have reduced the value of NSS Labs' public testing because of its inability to test all EPP products and AEP products, including some of the significant EPP products and AEP products on the market whose vendors refuse to deal with testing companies, like NSS Labs, who do not adhere to the AMTSO Testing Standard.

143.     In particular, in addition to CrowdStrike, who declined to participate in NSS Labs public tests pursuant to the conspiracy even before formal adoption of the AMTSO Testing Standards, four significant AEP vendors and AMTSO  members  who previously participated in NSS Labs public tests "have declined to participate" in the NSS Labs Group Test after adoption of the AMTSO Testing Standard, depriving  NSS Labs  of millions of dollars in revenue.  NSS Labs is informed and  believes and thereon alleges that these four AEP vendors "declined to  participate" pursuant to the  conspiracy to make the supposedly voluntary AMTSO Testing Standard mandatory in fact.

144.     As a result of the conspiracy, NSS Labs has lost sales and profits from the sale and license of its public testing reports, including its AEP Group Test reports, because fewer customers purchase reports and/or are willing to pay less for reports that do not include all market participants than would purchase reports that included all market participants.

145.     In addition, NSS Labs has lost sales and profits from the sale and license of its public testing reports, including its AEP Group Test reports, because it cannot charge customers who purchase reports that do not include all market participants as much as it could charge for reports that included all market participants.

146.    Further, NSS Labs has lost sales and profits from the sale and license of marketing rights to its public testing reports, including its AEP Group Test reports, because it cannot charge as much for marketing rights to customers which do not include all market participants as it could charge for marketing rights to reports that included all market participants.

147.    Finally, NSS Labs has lost sales and profits from the performance of private testing for both cybersecurity product vendors and their actual and potential customers, for which NSS Labs does charge a fee, because the EPP Vendor Conspirators purport to prohibit even private testing of their products by testing companies who do not adhere to the AMTSO Testing Standard.

**COUNT I**
**PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(GROUP BOYCOTT)**

148.    NSS Labs realleges paragraphs 1-147, inclusive.

149.    Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.    Defendants have refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

151.    Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

152.    AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

153.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

154.    Defendants' refusal to deal affected interstate commerce as herein alleged.

155.    Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing EPP products generally and AEP products in particular as herein alleged.

156.    NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

157.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

158.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

159.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

160.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

161.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT II**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**UNDER THE RULE OF REASON**
**(GROUP BOYCOTT)**

162.    NSS Labs realleges paragraphs 1-147, inclusive.

163.    Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

164.    Defendants have refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

165.    Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

166.    AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

167.    Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets  in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

168.    Defendants' refusal to deal affected interstate commerce as herein alleged.

169.    Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing EPP products generally and AEP products in particular as herein alleged.

170.    NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

171.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

172.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

173.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

174.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

175.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT III

### PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (CONSIRACY TO RAISE OR MAINTAIN QUALITY-ADJUSTED PRICES)

176.    NSS Labs realleges paragraphs 1-147, inclusive

177.    Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce to raise or maintain the quality-adjusted prices of the EPP Vendor Conspirators' products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

178.    AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

179.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

180.    Defendants' contracts, combinations, and/or conspiracies affected interstate commerce as herein alleged.

181.    Defendants' contracts, combinations, and/or conspiracies disadvantaged NSS Labs by denying it access to the market for testing EPP products generally and AEP products in particular as herein alleged.

182.    NSS Labs was injured in its business or property as a result of Defendants' unlawful acts as herein alleged.

183.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

184.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

185.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

186.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

187.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT IV**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**UNDER THE RULE OF REASON**
**(CONSIRACY TO RAISE OR MAINTAIN QUALITY-ADJUSTED PRICES)**

188.    NSS Labs realleges paragraphs 1-147, inclusive

189.    Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce to raise or maintain the quality-adjusted prices of the EPP Vendor Conspirators' products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

190.   AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

191.   Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in violation of Section 1 of Sherman Act, 15 U.S.C. § 1.

192.   Defendants' contracts, combinations, and/or conspiracies affected interstate commerce as herein alleged.

193.   Defendants' contracts, combinations, and/or conspiracies disadvantaged NSS Labs by denying it access to the market for testing EPP products generally and AEP products in particular as herein alleged.

194.   NSS Labs was injured in its business or property as a result of Defendants' unlawful acts as herein alleged.

195.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

196.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

197.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

198.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

199.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

### COUNT V
### PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### (BEING DISADVANTAGED BY A MEMBERSHIP ORGANIZATION)

200.   NSS Labs realleges paragraphs 1-147, inclusive.

201.   AMTSO by and through its officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

202.    AMTSO has enacted the anti-competitive AMTSO Testing Standard and encouraged its members to refuse to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

203.    Defendants' refusal to deal was pursuant to an agreement orchestrated by AMTSO.

204.    AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

205.    AMTSO's and Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

206.    AMTSO's acts as herein alleged and Defendants' refusal to deal affected interstate commerce as herein alleged.

207.    AMTSO's acts as herein alleged and Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

208.    NSS Labs was injured in its business or property as a result of AMTSO's acts as herein alleged and Defendants' refusal to deal as herein alleged.

209.    NSS Labs has suffered antitrust injury as a result of AMTSO's unlawful acts as herein alleged.

210.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

211.    NSS Labs seeks an injunction against further wrongful acts of AMTSO pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

212.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

213.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT VI
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### UNDER THE RULE OF REASON
### (BEING DISADVANTAGED BY A MEMBERSHIP ORGANIZATION)

214.   NSS Labs realleges paragraphs 1-147, inclusive.

215.   AMTSO by and through its officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

216.   AMTSO has enacted the anti-competitive AMTSO Testing Standard and encouraged its members to refuse to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

217.   Defendants' refusal to deal was pursuant to an agreement orchestrated by AMTSO.

218.   AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

219.   AMTSO's and Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of Sherman Act, 15 U.S.C. § 1.

220.   AMTSO's acts as herein alleged and Defendants' refusal to deal affected interstate commerce as herein alleged.

221.   AMTSO's acts as herein alleged and Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged and AMTSO has no efficiency-increasing justification for the restrictions imposed by the AMTSO Testing Standard.

222.   NSS Labs was injured in its business or property as a result of AMTSO's acts as herein alleged and Defendants' refusal to deal as herein alleged.

223.   NSS Labs has suffered antitrust injury as a result of AMTSO's unlawful acts as herein alleged.

224.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

225.    NSS Labs seeks an injunction against further wrongful acts of AMTSO pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

226.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

227.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT VII**
**PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(USE OF MEMBERSHIP ORGANIZATION TO COMMIT ANTITRUST VIOLATIONS)**

228.    NSS Labs realleges paragraphs 1-147, inclusive.

229.    Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

230.    Defendants have used AMTSO to enact the anti-competitive AMTSO Testing Standard and refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

231.    Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

232.    AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

233.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

234.    Defendants' refusal to deal affected interstate commerce as herein alleged.

235.    Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

236.     NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

237.     NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

238.     NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

239.     NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

240.     NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

241.     NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

### COUNT VIII
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### UNDER THE RULE OF REASON
### (USE OF MEMBERSHIP ORGANIZATION TO COMMIT ANTITRUST VIOLATIONS)

242.     NSS Labs realleges paragraphs 1-147, inclusive.

243.     Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

244.     Defendants have used AMTSO to enact the anti-competitive AMTSO Testing Standard and refused to deal with NSS Labs because NSS Labs does not adhere to the AMTSO Testing Standard both as adopted and as agreed to by the EPP Vendor Conspirators before the adoption of the AMTSO Testing Standard.

245.     Defendants' refusal to deal was pursuant to an agreement among the EPP Vendor Conspirators who are direct competitors of each other.

246.     AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

247.    Defendants' contracts, combinations, and/or conspiracies Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

248.    Defendants' refusal to deal affected interstate commerce as herein alleged.

249.    Defendants' refusal to deal disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

250.    NSS Labs was injured in its business or property as a result of Defendants' refusal to deal as herein alleged.

251.    NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

252.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

253.    NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

254.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

255.    NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**COUNT IX**
**PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**AGAINST ONLY AMTSO**
**(MEMBERSHIP ORGANIZATION IS INHERENTLY ANTICOMPETITIVE)**

256.    NSS Labs realleges paragraphs 1-147, inclusive.

257.    AMTSO is an inherently anti-competitive organization by virtue of its stated purpose, which ultimately led to the adoption of the unlawful AMTSO Testing Standard and, through its members, officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

258.   The existence and operation of AMTSO itself is a *per se* violations of Section 1 of Sherman Act, 15 U.S.C. § 1.

259.   AMTSO has disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

260.   NSS Labs was injured in its business or property as a result of AMTSO's existence and conduct as herein alleged.

261.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

262.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

263.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

264.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

265.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT X
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### UNDER THE RULE OF REASON
### (MEMBERSHIP ORGANIZATION IS INHERENTLY ANTICOMPETITIVE)

266.   NSS Labs realleges paragraphs 1-147, inclusive.

267.   AMTSO is an inherently anti- competitive organization by virtue of its stated purpose, which ultimately led to the adoption of the unlawful AMTSO Testing Standard and, through its members, officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

268.   The existence and operation of AMTSO itself unreasonably restrain trade in one or more of the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and there is no efficiency-increasing justification for the existence of AMTSO whose objection is the adoption

to anti-competitive restrictions on the testing of EPP products such as those embodied in the AMTSO Testing Standard

269.   AMTSO has disadvantaged NSS Labs by denying it access to the market for testing cybersecurity products generally and AEP products in particular as herein alleged.

270.   NSS Labs was injured in its business or property as a result of AMTSO's existence and conduct as herein alleged.

271.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

272.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

273.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 26.

274.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 15(a).

275.   NSS Labs is automatically entitled to its costs of suit pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## COUNT XI
### PER SE VIOLATION OF THE CARTWRIGHT ACT,
### CALIFORNIA BUSINESS & PROFESSIONS CODE § 16720

276.   NSS Labs realleges paragraphs 1-147, inclusive.

277.   Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of the Cartwright Act, California Business and Professions Code § 16720.

278.   NSS Labs is a "person" within the meaning of the Cartwright Act, California Business and Professions Code § 16720.

279.   AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

280.   Defendants' contracts, combinations, and/or conspiracies are *per se* violations of the Cartwright Act, California Business and Professions Code § 16720.

281.   NSS Labs has suffered antitrust injury as a result of Defendants' unlawful acts as herein alleged.

282.   NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

283.   NSS Labs seeks an injunction against further wrongful acts of Defendants pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

284.   NSS Labs is automatically entitled to its reasonable attorney fees pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

285.   NSS Labs is automatically entitled to its costs of suit pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

**COUNT XII**
**VIOLATION OF THE CARTWRIGHT ACT,**
**CALIFORNIA BUSINESS & PROFESSIONS CODE § 16720,**
**UNDER THE RULE OF REASON**

286.   NSS Labs realleges paragraphs 1-147, inclusive.

287.   Defendants by and through their officers, directors, employees, agents or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce in violation of the Cartwright Act, California Business and Professions Code § 16720.

288.   NSS Labs is a "person" within the meaning of the Cartwright Act, California Business and Professions Code § 16720.

289.   AMTSO, although a competitor of neither the EPP Vendor Conspirators nor NSS Labs, is liable as the "hub" in a "hub and spoke conspiracy" facilitating the conspiracy and without which the conspiracy would have been difficult to effect.

290.   Defendants' contracts, combinations, and/or conspiracies unreasonably restrain trade in one or more of the Relevant Markets in violation of the Cartwright Act, California Business and Professions Code § 16720.

291.    NSS Labs has suffered antitrust injury as a result of Defendant's unlawful acts as herein alleged.

292.    NSS Labs seeks damages according to proof, which damages shall be automatically trebled pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

293.    NSS Labs seeks an injunction against further wrongful acts of defendants pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

294.    NSS Labs is automatically entitled to its reasonable attorney fees pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

295.    NSS Labs is automatically entitled to its costs of suit pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

**PRAYER FOR RELIEF**

NSS Labs prays for relief as follows:

a)    That the Court adjudge and decree that Defendants' acts as herein alleged violate Section 1 of the Sherman Act; 15 U.S.C. § 1;

b)    That the Court adjudge and decree that Defendants' acts as herein alleged violate the Cartwright Act, California Business & Professions Code §16720, et seq.;

c)    That Defendants, and each of them, and all persons acting in concert with them, be temporarily restrained, preliminarily enjoined and permanently enjoined and restrained from acting pursuant to the agreements herein alleged and from establishing any similar agreement unreasonably restricting competition except as prescribed by the Court;

d)    That NSS Labs be awarded damages according to proof, and that such damages be automatically trebled as required by Section 4 of the Clayton Act, 15 U.S.C. § 15 and California Business & Profession Code § 16750(a);

e)    That NSS Labs be automatically awarded its attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and California Business & Profession Code § 16750(a);

f)    That NSS Labs be awarded its costs; and

g)    That NSS Labs be awarded such other relief as the Court may deem just and proper.

1

2
Dated:  September 12, 2019          FEINBERG DAY KRAMER ALBERTI LIM
                                    TONKOVICH & BELLOLI LLP
3

4
                                    By  /s/ *Ian N. Feinberg*
                                    _____
                                         Ian N. Feinberg
5
                                         *Attorneys for Plaintiff*
6                                        NSS Labs, Inc.

7
                          **DEMAND FOR JURY TRIAL**
8
         NSS Labs demands trial by jury for all issues so triable pursuant to Fed. R. Civ. P. 38(b)
9
and Civil L.R. 3-6(a).
10
   Dated:  September 12, 2019          FEINBERG DAY KRAMER ALBERTI LIM
11                                     TONKOVICH & BELLOLI LLP

12
                                    By  /s/ *Ian N. Feinberg*
                                    _____
13                                       Ian N. Feinberg

14                                       *Attorneys for Plaintiff*
                                         NSS Labs, Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28